(C. D. 1281)

THE FROST RAILWAY SUPPLY CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 6, 1950)

*John C. Ray* for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Dorothy C. Bennett* and *Richard H. Welsh*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Our jurisdiction has been invoked pursuant to the terms of section 514 of the Tariff Act of 1930 (19 U. S. C. § 1514) to determine the proper dutiable classification of an importation described on the consular invoice and entry papers as "Railroad Truck Spring Snubbers." For brevity, they will be referred to *infra* as "snubbers."

The importation was classified by the collector of customs as "Articles or wares not specially provided for, * * * if composed wholly or in chief value of iron, steel, * * * or other metal," as described in paragraph 397 of said act (19 U. S. C. § 1001, par. 397), and duty was accordingly assessed at the rate of 45 per centum ad valorem.

Plaintiff makes the following two claims for lower rates of duty:

1. That the merchandise should be classified in accordance with the provision in paragraph 312 of said act (19 U. S. C. § 1001, par. 312), as modified by the trade agreement between the United States and Belgium, effective May 1, 1935, 67 Treas. Dec. 470, T. D. 47600, the pertinent portion being italicized:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns or posts, and deck and bulb beams, *together with all other structural shapes of iron or steel;* any of the foregoing machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting—

and subject to duty at the rate of 15 per centum ad valorem.

2. If not classifiable as above indicated, then it is contended that the commodity is embraced within the provision for machines, finished or unfinished, not specially provided for, in paragraph 372 of said act (19 U. S. C. § 1001, par. 372) and dutiable at 27½ per centum ad valorem.

At the trial, three well-qualified witnesses were called, all of whom testified on behalf of the plaintiff. From their testimony the following facts were established.

These snubbers, so called, a patented product, were invented by a Mr. Frost, the father of the first witness, Harry W. Frost, one of the principals of the plaintiff company. They are, relatively speaking, a modern invention in the equipment of railway freight cars, and during approximately the past 15 years over a million of such cars, which is stated to be one-half of all freight cars in use in the United States and Canada, has been equipped with them.

As will appear *infra*, their use has contributed in great measure to the economic utility of such railway rolling stock.

A sample of one of the imported snubbers, weighing approximately 23 pounds, was received in evidence and marked exhibit 1. A miniature snubber, one-quarter size, was also received in evidence as illustrative exhibit 3, and was introduced to illustrate in simple form the action of the imported articles. It appears that similar articles have been manufactured by the Detroit Steel Products Co. of Detroit, Mich., whereas the present importation was manufactured in Canada by B. J. Coghlin Co., Ltd.

A description of the snubber represented by exhibit 1 is well stated in the testimony of plaintiff's third witness, Endsley, as follows:

It consists of a center coil of metal going entirely through the snubber from top to bottom. That part of the spring has inclined surfaces on both sides forming a wedge between the inclined surfaces. There are three outer coils of metal that have the opposite, they have inclined surfaces on the inside which cooperate with the wedges of the inside coil, and as the spring is compressed, these inner coils get closer together and rub transversely of each other on the outer coil. The outer coil then gets a larger radius of diameter because it is pushed out by its own wedge, and the wedge on the inner coil. Therefore, the ends of the outer coil must travel around the spring. So we get rubbing in two directions between the inner and outer coils. The total movement of the ends of the outer coil is more than the travel of the spring going up to three inches. Each end of this outer coil going about a half an inch, and the total travel being approximately three inches travel of the ends. The center stays still, but has a transverse rubbing all the way around.

The witness Frost stated that he had seen hundreds of cars in operation both with and without snubbers in the trucks; that a snubber "acts to the freight car the same as a shock absorber acts to an automobile"; that it limits the movement of the springs, diminishes the violence of the action of the car body, reduces breakage of the coil springs, and lessens damage "to the lading of the car."

Further, he testified that the snubber is used in connection with coil springs in the suspension nest of the car; that a suspension nest is a group of springs under each corner of the car over the truck on which the car body rides. He stated that a four-spring nest with a snubber inserted in a railway car carries a quarter of the weight of the car on compression of the springs so that exhibit 1 would carry one-sixteenth of the weight, and that on release it would carry less, or about one-fifth of one-sixteenth; that as the car moves along on the roadbed, it reduces the stresses that would go onto the springs, and that there are a minimum of four and a maximum of seven springs in each nest, a boxcar having four of such nests, each of which contains a snubber. Mr. Frost also stated that the normal nest of springs would be a four-spring nest; that they take one spring out and replace it with a snubber like exhibit 1; that exhibit 1 is the same height as the springs they are used with; and in view of the weight of the cars as they are loaded today and the speed of the trains, articles like exhibit 1 are pretty much indispensable parts of the cars.

On cross-examination, Mr. Frost testified that the snubbers are used only on freight cars and are not part of the superstructure of the car; that the superstructure rests on the seat of the truck or framework that holds the wheels; that a freight car can operate without a snubber like exhibit 1; and that there are cars equipped with and without them. He stated further that snubbers like exhibit 1 were first introduced in 1936; that exhibit 1 differs from the other springs in the nests in that the other springs are standard coil springs, whereas exhibit 1 is a device with outer coils working on an inner coil which produces friction. He also testified that exhibit 1 has a mechanical feature or device which generates or applies energy or force; that the mechanical feature is that the outer coils, which are separate from the inner coils, are wound onto the inner coils which expand and contract when the springs are in motion; and that in operation, the outside coil expands and contracts, moving over the inclined planes of the inner coils, which produces friction.

Further, on cross-examination, the witness testified that the friction does not generate power, it reduces the vibration of the springs in the car body, and it takes away the motion of the car body; that in and of itself, a freight car does not have any mechanical devices which generate force or power; and that it is simply towed or pulled by the engine.

On redirect examination, Mr. Frost testified that without snubbers there would be a greater number of failures of coil springs and the damage to the lading would be higher.

Harry G. Love, a former member of the United States Railroad Retirement Board, and before that a shop superintendent of the "Grand Trunk, Western," in which capacity he supervised about 650

men in repairing cars, rebuilding cars, and building new cars, having had 47 years of railroading experience in the car department, testified that he had superintended the insertion of hundreds of these snubbers in the equipment of the Grand Trunk Railroad. He stated that the sole purpose of the snubbers is to assist the present old-type car springs in carrying the weight and to overcome the breakage of said springs; that the snubber is an auxiliary or assistant to the present spring; that it carries some of the weight of the car load but how much he did not know; that it is an indispensable part of the railroad car; and that since the use of the snubbers, the breakage of the old-type springs was reduced considerably.

Louis E. Endsley, a consulting engineer of long experience and highly qualified, was the third witness appearing on behalf of plaintiff. After describing exhibit 1 (as set forth, *supra*), he testified that it has a little of the characteristics of a spring but that it is a machine for absorbing energy; that in its compression and release it absorbs a great many hundred-inch pounds; that a railroad car has two vibrations: (1) The joints of the rails are always slightly lower than the center of the rails, and that nearly all railroads in the United States are ledge-staggered, that is, the joint of the rail on the right is in the middle of the rail on the left track, so that a 33-foot rail would hit a low spot every 16½ feet; (2) the car body rocks backwards and forwards on its springs. He continued by stating that in the swaying and rocking of the car, snubbers like exhibit 1 take out or absorb the energy that is put in each time the car hits a low spot; that the snubber carries its share of the weight going down, but "coming back it has about one-fifth as much."

The witness Endsley stated further that exhibit 1 absorbs the stresses of the car upon it and that besides carrying weight and bearing tension, its main function is absorbing foot pounds or inch pounds of energy; that it varies the forces coming upon the side frame and upon the bolster; that the side frame is that part of the car through which the axles go; that the snubber and springs rest upon it, and the bolster protrudes through a transom hole and moves up and down upon the springs and snubber. He also stated that exhibit 1 is manufactured out of a high carbon spring steel; that said steel is one which by hardening acquires a long life if it is in contact with iself; that there are 140 square inches of contact between these two pieces and as they go around each other, they slide lengthwise, crossways, and down, polishing each other, and last much longer. He testified further that the principal function of exhibit 1 is to absorb energy, which it does all within itself and does not pass on the energy to some other part of the railroad car; and that exhibit 1 is an indispensable part of a railroad car.

On cross-examination, the witness Endsley testified that the energy

which the snubbers absorb is generated primarily by low spots on the track and not from the mechanism of the locomotive hauling the car; that a snubber is part of the truck upon which the car body and the springs rest, and is indispensable to a freight car from the standpoint of economy of operation.

We shall consider first the claim for classification of the imported merchandise as structural shapes within the purview of paragraph 312, *supra*.

In the case of *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079, the court affirmed the judgment of the trial court in holding that deformed steel bars, not advanced beyond hammering, rolling, or casting, principally used as reinforcement for concrete, were structural shapes within the meaning of paragraph 312 of the Tariff Act of 1922 (which is analogous to paragraph 312, *supra*, as modified). In arriving at its conclusion, the court stated:

\* \* \* It is true, the present case presents for consideration an importation which might be considered upon the border line between material, such as we have held is covered by said paragraph 304, *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, and structural shapes, as provided for by said paragraph 312. Applying the principles, however, stated in the last cited case as well as in *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, there does not seem to be any inherent difficulty in arriving at a satisfactory conclusion.

In the *Simon, Buhler & Baumann* case, *supra*, the question for decision was whether certain channels and grates of steel, parts of a brewery filter, were manufactures of metal, under paragraph 167, or structural shapes of steel, under paragraph 104 of the Tariff Act of October 3, 1913. In deciding the matter, Smith, J., speaking for the court, said:

> Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose, it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains, and artificially joined together for some special use. But, however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

In *United States* v. *Frank*, *supra*, the classification of certain sheet-steel piling was involved. It was classified by the collector as steel, not specially provided for, under paragraph 304 of the Tariff Act of 1922, and was claimed to be dutiable as structural shapes not advanced, under paragraph 312 thereof. A short quotation from the opinion in that case shows the use of the sheet-steel piling:

> From their testimony it appears that such material is commonly used in the construction of dams, including core walls after installation, for building foundation work, including retaining walls and foundation piers, for dock walls, for elevator shafts, and for breakwaters. In using the piling in foundation work for buildings, it is shown that the piling is usually driven on both

sides of the space intended for the foundation, the earth is then removed, and the space thus left is filled with concrete. When so used it appears that the steel piling is usually not afterwards removed, and remains as a reinforcement of the concrete structure. It is also sometimes embedded in concrete and thus forms a part of the foundation.

After reviewing the various authorities, this court then quoted with approval the definition of "structural shapes" found in *Birtwell* v. *Saltonstall*, 39 Fed. 383:

It appears from the evidence that, speaking in a broad commercial sense, the term "merchantable iron" is limited to rounds, squares, and flats; that anything else, such as beams, girders, angles, etc., having any special shape, and intended to be used in the form of a structure, is a structural shape.

The court then also cited with approval the *Simon, Buhler & Baumann* case, *supra*, demonstrated that the construction in the cases cited was in conformity with the ordinary meaning of the statutory terms used, and concluded:

The sheet piling in the case at bar plainly comes within the definition first above given. It is so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures. While much of it is used under ground, lexicographers agree that a structure is not confined to that part of a building which appears above the ground. It is argued that the use of such piling being temporary, it is not a true structural material. Without attempting to foreclose discussion on this point, it is sufficient to suggest that the testimony shows that at least one-half of this piling is permanently installed in structures, where it forms a very essential and necessary part. If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification.

The same guiding principle is also expressed in *E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240, wherein universal mill plates used in the construction of columns, posts, beams, and girders by riveting them to angles, channels, I-beams, and other structural shapes, in order that the column, girder, post, or beam might have greater strength, were held not to come within the provision for "structural shapes" in paragraph 312 of the Tariff Act of 1922. See also *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225, likewise holding that wire netting used for forming a net for holding stucco in the sides of structures was not within the provision for "structural shapes" in said paragraph 312. In the course of its opinion in the latter case, the court stated—

In construing the general provision, "all other structural shapes of iron or steel," etc., we think it eminently proper to consider the question as to whether the articles sought to be included within its terms are of the same kind, class or nature as the articles specifically named in the paragraph, such as "beams, girders, joists," etc.

This rule of interpretation is not to be regarded as controlling in all instances, *United States* v. *R. F. Downing & Co.*, 17 C. C. P. A. (Customs) 194, T. D. 43645, but it may be controlling where the proper construction of a tariff paragraph is in doubt and where the intent of the legislature is not otherwise more persuasively indicated. *United States* v. *Imperial Wall Paper Co.*, *supra*. [14 Ct. Cust. Appls. 280, T. D. 41886.]

We do not think the wire netting at bar is of the same class or nature as the

articles specifically named, and this fact is at least one of the considerations which bring us to the conclusion that it should not be classified under paragraph 312.

The body of decisions on this phase of the case clearly indicates that the statutory term "structural shapes" has reference to metal structural members capable of giving the greatest strength with the least weight, especially adapted to structural purposes, and which are "of the same kind, class or nature as the articles specifically named in the paragraph, such as 'beams, girders, joists,' etc." In other words, such shapes must be, in fact, members used to frame or form a structure in the course of construction and to give support to the structure.

Applying the doctrine of the cases above discussed to the facts of record here, we are satisfied that the snubbers in controversy do not answer the call of paragraph 312, *supra*, as modified, inasmuch as they do not constitute "structural shapes" as that term has been judicially construed. If these snubbers are "structural shapes," there is no apparent reason why the coil springs used in conjunction with the snubbers should not also be so regarded, to which we cannot give our assent. We accordingly hold that the articles represented by exhibit 1 herein do not come within the provisions of said paragraph 312.

It remains to be determined whether the snubbers in controversy are properly classifiable as machines within the purview of paragraph 372, *supra*. The blueprint for classification of a machine was drafted by our appellate court in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, when it adopted the following definition of a machine from the Standard Dictionary, Webster's New International Dictionary, and Lockwood's Dictionary of Mechanical Engineering Terms:

* * * a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion * * *.

That this definition was not intended by the court to receive a literal interpretation is made evident by later decisions which have placed appropriate limitations upon the definition in order that it should receive a sane and rational application.

As was said by our appellate court in *United States* v. *Guth Stern & Co., Inc.*, 21 C. C. P. A. (Customs) 246, T. D. 46777, in holding that certain devices for sharpening safety-razor blades are machines under said paragraph 372:

* * * it has never been the purpose of this court to hold arbitrarily that the definition is so rigid and exact in its terms as to include any and all devices and mechanisms that may happen to be literally embraced within it. An examination of numerous definitions given in the very authorities cited in the *Simon, Buhler & Baumann* case, *supra*, discloses distinctions which should be taken as

matters of common knowledge. For example, in Webster's New International Dictionary, it is said:

> * * * According to the strict definition, a crowbar abutting against a fulcrum, a pair of pliers in use, or a simple pulley block with its fall, would be a machine, but ordinary usage would hardly include such as these; while an implement or tool whose parts have no relative movement, as a hammer, saw, chisel, plane, or the like, would not, of itself, in any case be a machine. Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, cog and sprocket wheels, pulleys, shafts, and spindles, ropes, chains, and bands, cams and other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc.

In the case of *United States* v. *J. E. Bernard & Co., Inc.,* 30 C. C. P. A. (Customs) 213, C. A. D. 235, the appellate court affirmed the trial court's judgment to the effect that vertical field balances were machines within said paragraph 372. In its opinion therein, the court stated:

> * * * In view of the kind of machines Congress specifically referred to in paragraph 372, and taking into cognizance the more applicable definitions found in the lexicographical authorities as applied to the term "machine" when referred to in a tariff sense, we think that for an importation to respond to that term it must be something more than a "crowbar," "a pair of pliers," or, as was said in the *Simon, Buhler* case, "a kitchen colander or a box of sand for clearing muddy water." It is our opinion that a machine such as Congress had in mind must have some movable parts, and it must do some of the things pointed out in the *Simon, Buhler* case. * * *

For a case bearing some analogy in principle to the one at bar and involving the application of the machine provision contended for, reference is made to *M. Pressner & Co.* v. *United States,* 38 C. C. P. A. (Customs) 8, C. A. D. 431, involving an importation of zippers, claimed by plaintiff therein to be machines within the purview of paragraph 372, *supra.* The appellate court affirmed the trial court in overruling this claim of plaintiff, and cited with approval the following language from the opinion of the lower tribunal:

> * * * they [the zippers] are merely moved up or down to the extent that hand power is supplied. Energy or force is not applied by the zipper but rather energy or force is applied to it by the hand power. Neither is it true that energy or force is modified or utilized by the zipper. The testimony of plaintiff's witness that pulling the zipper tab in a longitudinal direction causes a transverse force to be exercised on the slider is not such modification or utilization of energy or force as is contemplated by the provision for "all other machines" in said paragraph 372 as construed in the *Simon, Buhler & Baumann* case, *supra,* and as defined and delimited in the long line of decisions which followed it. It is also clear from the evidence before us that in the functioning of the zippers there is no transmission of motion.

To adopt or apply the scientific principles so ably illustrated by plaintiff's witness Church would lead us far afield and result, in substance, in regarding

such things as crowbars and wedges as being within the tariff classification of machines.

The rationale of the *Pressner* case, *supra*, is equally applicable to the case here before us. From the evidence it is quite apparent that there is no utilization, application, or modification of energy or force, nor transmission of motion in the employment of snubbers in the nests of springs used in railway freight cars. Rather is it shown that the purpose of the snubbers is to "absorb" the vibration of the springs in the body of a freight car, and "to take away the motion." From the testimony of plaintiff's witness Endsley, we quote the following excerpt:

Q. Do you testify that the principal function of the snubber is to absorb energy?—A. That is correct.

Q. Was the absoroption [sic] in itself, or does it pass on the energy to some other part of the railroad car?—A. It does it all within itself.

Q. In other words, it is a compact unit which performs all of these functions all in itself, is that right?—A. That is true.

Plaintiff's witness Frost, in describing the function of a snubber, stated:

It acts to the freight car the same as a shock absorber acts to an automobile. It limits the movement of the springs, eliminates the violence of the action of the car body, eliminates breakage of the coil springs, and reduces the damage to the lading of the car.

One would hardly contend that a rubber heel or a chair cushion containing springs would be a machine for the reason that it absorbs shock.

The imported articles also fail to meet the requirements of a "machine," as judicially determined, for the reason that, in our opinion, the mere interactions of the inner and outer coils which constitute a snubber are not such "movable parts" as was contemplated by our appellate court in the *Bernard* case, *supra*.

Inasmuch, therefore, as the articles in controversy contain no movable parts within the legal concept, and since they do not utilize, apply, or modify energy or force, or transmit motion, we are constrained to hold that plaintiff's claim for classification of the present importation within the provision in paragraph 372, *supra*, for machines, finished or unfinished, not specially provided for, is without merit.

Judgment will issue in accordance with the views above expressed.