UNITED STATES *v*. THE WINKLER-KOCH ENGINEERING CO. (No. 4773)[1]

United States Court of Customs and Patent Appeals, November 2, 1953

*Warren E. Burger*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

*Philip Stein* (*Marjorie M. Shostak* of counsel) for appellee.

[1] C. A. D. 540.

122

[Oral argument October 6, 1953, by Mr. Weeks and Mr. Stein]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment entered by the Second Division of the United States Customs Court in conformity with its decision, C. D. 1494, 30 Cust. Ct. 26, sustaining the protest of appellee against the classification of, and consequent duty assessment upon, certain merchandise by the Collector of Customs at the port of Houston, Texas. The merchandise is referred to broadly in the court's decision as "Seamless hot rolled A. P. I. [American Petroleum Institute] Casings," and is described therein in more minute detail.

The brief on behalf of the Government before us states:

These casings were designed and fabricated for use in constructing oil wells and they serve the dual purpose of a retaining wall after the well-hole has been dug and they also provide a hollow interior to protect tubing which has been run through the hole for use in bringing oil from subterranean sources to the surface.

It is academic that the classification of merchandise for duty purposes is governed by its condition as imported, and there is no dispute here respecting the condition of the instant merchandise as imported.

The importation consisted of 2100 hollow, cylindrical, seamless sections made of steel by a hot rolling process. They were shipped loose and unwrapped in the hold of the vessel in which imported. The sections were 7 inches in outside diameter. They ranged from 25 feet to 32 feet in length and weighed 24 pounds to the linear foot. The ends of the sections had been threaded by machining and were thus prepared for being screwed together, or joined by couplings, to form a casing of the length required by the depth of the particular well in which used. So, strictly speaking, while each section was a completed or finished article, it was in fact a part, that is, a unit to be combined with other like units to form a casing for use in oil wells of various depths. The uncontradicted testimony of a number of competent witnesses engaged in activities incident to procuring petroleum from its subterranean sources, is to the effect that 99% of articles of the type of those here involved are used in forming oil well casings. Any other use of them is fugitive. As hereinbefore indicated, A. P. I. are the initials of the American Petroleum Institute and they show, when stamped upon the casing units, that such units conform to the specifications and requirements of that Institute. It also appears from the record that the oil producing states of the United States have laws,

or regulations enforced by legally constituted authorities in the interest of conservation and safety, which make mandatory the use of casings in all oil wells with tubing inserted therein through which tubing the oil is brought to the surface without having any contact with the casing.

The brief on behalf of appellee (the importer) presents a statement, based upon the evidence of record, relating to "The relationship of the casings at bar to the drilling of oil wells," which we here reproduce, omitting only the references to pages of the record. The italics are those of the authors of the brief:

> First, a hole is drilled for an oil well by a drill stem with a drill bit on the bottom, of the particular size of the casing which is to be placed in the well. The turning of the drill stem makes a hole in the earth. After a hole is made and a certain depth is reached, the drill stem is pulled from the hole, and *casing* (the merchandise at bar) is then run in. The *casing* is placed into the ground for the purpose of *forming and protecting the hole* which has been drilled, and *keeping the hole open*. The lengths of casing are screwed together by means of the threads at the ends, and are forced down into the hole. *The casing is sometimes cemented into the hole, particularly at the bottom.* Thereafter, upon reaching the desired depth where oil is found, it is customary to perforate, or open, or expose the forms; that is, drill out the cement plug at the bottom of the hole. Tubing is then put inside the casing. Tubing is usually about 2 or 3 inches in diameter, in about the same lengths and joints as casings (30-foot joints). The tubing goes down into the hole to the foot (or bottom) of the hole. The oil comes up through the tubing, and does not usually or intentionally strike the walls of the casing. The casing encases or surrounds the tubing through which the oil is brought to the surface. Casing is put in the oil well to maintain the tubing within it. The tubing, through which the oil is pumped out, goes inside the casing.

It is deduced from the evidence that the casings are cemented with concrete at their bottoms—sometimes from "top to bottom"—and that they are installed to remain undisturbed so long as the wells in which they are sunk are in operation. When a well ceases to yield oil or is abandoned, so much of the casing as can be pulled from the hole is salvaged and used again for casing or for scrap steel.

With respect to the tubing, one of the witnesses, who was an active engineer in the drilling of oil wells, in answer to the question "Is the tubing a temporary or permanent installation?" testified:

> The tubing is—well, it is not permanent. You run a string of tubing in a well and it is not in that well as long as you have a well. It may be there as long as the well flows but when it stops flowing you must pull that tubing and install your necessary equipment to pump the well, and after you pump the well, then during the process of pumping you may pull this tubing several times, maybe a few hundred times in the life of the well, so it is in and out of the well on a temporary basis.

The collector's classification was made under the provision in paragraph 328 of the Tariff Act of 1930 (19 U. S. C. sec. 1001, par. 328)

for "all other finished or unfinished iron or steel tubes not specially provided for," and duty was assessed at the rate of 25 per centum ad valorem.[1]

The claim of the importer, which the trial court sustained, is, in essence, that the imported articles are structural shapes of steel advanced beyond rolling by machining, and fabricated for use as oil well casing, and, therefore, dutiable at 15 per centum ad valorem because properly classifiable under paragraph 312 of the 1930 Tariff Act (19 U. S. C. sec. 1001, par. 312) as modified by the Trade Agreement between the United States and Belgium, T. D. 47600, 67 Treas. Dec. 470.[2]

It will be observed that the term "casings" is not used in either of the paragraphs at issue. In fact, the word has not been found by us anywhere in the Act.

Before taking any testimony in the instant case, counsel for appellee moved to introduce in evidence the record and exhibits in another protest case (903322–G) which arose between appellee and the Government (see *Winkler-Koch Engineering Co.* v. *United States*, 16 Cust. Ct. 42, C. D. 982), and Government counsel agreed to its introduction after it had been stipulated in effect that the merchandise involved in the two cases was substantially similar in all material respects. The decision of the trial court in that case was adverse to the importer but no appeal was taken. The importer made no claim there for classification under paragraph 312, *supra,* and the trial court therefore had no occasion to consider the applicability of the paragraph which constitutes its principal reliance here. The issue in that case, as presented to the court, was between different clauses of paragraph 328, and the trial court held that the merchandise was more specifically covered by the provision in that paragraph for "all other finished or unfinished iron or steel *tubes* not specially provided for," as classified by the collector, than by the provision in the same paragraph for "lap-welded,

---

[1] For convenience of reference the full text of paragraph 328 is here reproduced:

Par. 328. Lap-welded, butt-welded, seamed, or jointed iron or steel tubes, pipes, flues, and stays, not thinner than sixty-five one-thousandths of one inch, if not less than three-eighths of one inch in diameter, three-fourths of 1 cent per pound; if less than three-eighths and not less than one-fourth of one inch in diameter, 1¼ cents per pound; if less than one-fourth of one inch in diameter, 1¾ cents per pound: *Provided,* That no tubes, pipes, flues, or stays made of charcoal iron shall be subject to a less rate of duty than 1¼ cents per pound; cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; welded cylindrical furnaces, tubes and flues made from plate metal, whether corrugated, ribbed, or otherwise reinforced against collapsing pressure, and all other finished or unfinished iron or steel tubes not specially provided for, 25 per centum ad valorem; flexible metal tubing or hose, whether covered with wire or other material, including any appliances or attachments affixed thereto, not specially provided for, and rigid iron or steel tubes or pipes prepared and lined or coated in any manner suitable for use as conduits for electrical conductors, 30 per centum ad valorem.

[2] The text of paragraph 312 as modified by the Trade Agreement reads:

Par. 312. Beams, girders, joists, angles, channels, cartruck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel; any of the foregoing machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting . . . 15 per centum ad valorem.

butt-welded, seamed, or jointed iron or steel * * * pipes * * *," as claimed by the importer, the claim being that it was so classifiable directly or by virtue of the similitude provision of paragraph 1559 of the 1930 act.

The court held that recourse to the similitude provision of the act was not permissible because if not classifiable "under the eo nomine provision for tubes, as classified by the collector," they would fall within the general clause in paragraph 397 of the act.

In the instant case the question is, as stated in the brief on behalf of the Government, "Whether * * * articles such as the casings at bar are or are not structural shapes within the purview of paragraph 312, *supra.*"

The physical exhibits (segments of casing) treated as illustrative of the merchandise in the instant case were introduced as Collective Exhibit 1 in the former case along with other items, including a printed page from a handbook reciting the A. P. I. specifications "for grade C. seamless casings."

Those exhibits and much of the testimony of the witnesses called by the importer in the former case obviously are pertinent as evidence in the instant case.

The Government introduced no testimony or other evidence relevant to the ultimate issues in either of the cases.[3]

Three witnesses were called and testified in the former case and three others in the instant case. The testimony of the first three was amply analyzed by the trial court in its decision of that case and the analysis, to the extent necessary, was repeated in the instant case. The court also carefully paraphrased and analyzed the testimony and other evidence presented in the instant case.

The court directed attention to the fact that all the evidence, both oral and documentary, which was introduced upon the merits of the case was presented by the importer, appellee here, and correctly stated that "it stands uncontradicted, unrebutted, and unimpeached."

We deem it unnecessary to paraphrase the testimony ourselves or quote that of the trial court in detail. It is thought sufficient to quote its unchallenged findings of fact as follows:

(1) The merchandise consists of steel tubular goods which are known definitely throughout the principal oil fields of the United States as casings, and not as tubes.

(2) Said merchandise was made in strict accordance with specifications of the A. P. I. (American Petroleum Institute) so that whether made by one steel company or another, and regardless by whom it is ordered, the identical product would always be delivered upon an order for casings.

---

[3] At the time of the introduction in evidence of the record in the former case, the testimony of an examiner of merchandise at the port of Houston, Texas, who was called by counsel for the Government, was taken, but it related to the practice in examining merchandise at that port and concededly had no bearing upon the issue here involved.

(3) The uncontradicted testimony introduced by plaintiff, reinforced by the recognized A. P. I. specifications and standards, as well as by authoritative text books and publications on the subject (see exhibits 2, 3, and 6), establishes plaintiff's contention that casings are not known in the oil trade as tubes or tubing but are clearly differentiated (a) in size, casings having a substantially greater diameter than tubes; (b) in weight; and (c) in use.

(4) With respect to use, casings may be run to great depths, and serve a dual purpose (a) as a support to the wall of the hole that has been drilled and (b) as a protective medium for the tubing which is run inside the casing by means of which the oil is brought from subterranean sources to the surface. To perform these functions, the casings are made according to the specifications of the A. P. I. to withstand not only great hydrostatic pressure from the outside which might cause the casings to collapse, but also pressure from the inside, as well as vertical pressure and tension.

(5) That casings as a rule become permanent fixtures in the construction of a well since they are cemented in, while tubing may be withdrawn from time to time for use in other wells.

### The court said further:

We held in the incorporated case that, in the absence of competent and commercial proof to the contrary, a casing is a form of pipe and a pipe is a tube within the common meaning of the terms as ordinarily understood. However, as will be pointed out, *infra*, this question becomes academic here if such casings are, in fact, structural shapes of steel within the meaning of paragraph 312, *supra*. Upon this phase of the case, we are of the opinion, for the reasons which follow, that said casings are, in fact, structural shapes in the tariff sense.

In the course of its decision the trial court cited, with explanatory discussion, a number of cases which arose under different tariff acts wherein structural shapes were involved, and various cases were cited and analyzed in the briefs filed before us on behalf of the respective parties. No case, other than the *Winkler-Koch* case, *supra*, involving merchandise of the character and having the use of that here involved has been cited, nor have we found any.

In the case of *The Frost Railway Supply Company* v. *United States*, 39 C. C. P. A. (Customs) 90, C. A. D. 469, this court affirmed the judgment rendered by the United States Customs Court sustaining the action of the collector in classifying "railroad truck spring snubbers" under the provision for "Articles or Wares not specially provided for, * * * or other metal," in paragraph 397 (19 U. S. C. 1001, par. 397) of the Tariff Act of 1930, thus rejecting the importer's claim for classification under the provision in paragraph 312 of the Act, *supra*, for "all other structural shapes of iron or steel."

In the course of our decision there we said:

This court has had occasion in the past to define "structural shapes" as that term is applied to specific merchandise. No precise definition, however, can be laid down to cover the term, each case depending on its own record for determination. *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, 235, T. D. 46038; * * *.

We there cited a series of our decisions in which various articles were held to be classifiable as structural shapes within the meaning of paragraph 312, *supra*, and its predecessors in previous tariff acts. Also, we cited a series of our decisions in which various articles were held *not* to be classifiable as structural shapes within the meaning of that paragraph.

It is unnecessary to repeat here the reasoning set forth in all those decisions, but it is deemed appropriate to state here more fully than was there found necessary the pertinent conflicting claims which constituted the issues involved.

The case of *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537 (34 Treas. Dec. 157), may be said to be the pioneer case on the subject matter of "structural shapes" so far as appellate court decisions are concerned, and it has been regarded as largely controlling upon that subject. Hence, it appropriately may receive particular attention here.

It arose under the 1913 Tariff Act and the issue as to structural shapes was drawn between paragraph 167 of that act, under which the collector classified the merchandise, and paragraph 104 (forerunner of paragraph 312 of the 1930 Act, *supra*), one of the paragraphs under which the importer claimed.[4] The merchandise, as described in the decision of the Board of United States General Appraisers (now the United States Customs Court), consisted of "steel channel irons, steel bars or grates, and frames, plates, center pieces, posts, and heads or end pieces of cast iron, materials ready to be assembled as parts of a mash filter."

The particular phraseology of paragraph 312, *supra*, under which appellee in the instant case claims, that is, "structural shapes of iron or steel," was the precise phraseology used in paragraph 104 of the 1913 act which this court, affirming the trial tribunal, held applicable in the *Simon, Buhler & Baumann* case, *supra*.

The collector's classification in that case was under paragraph 167 of that act (1913), reading "Articles or wares not specially provided for in this [the metal] section * * * if composed wholly or in chief value of iron, steel * * * or other metal * * * and whether partly or wholly manufactured * * *." That precise phraseology is found in paragraph 397 of the Tariff Act of 1930, and not in paragraph 328 of that act, and it is the phraseology which the trial court held would have been alternatively applicable in its decision in the former *Winkler-Koch* case, *supra*. The merchandise to which the collector applied the phraseology in paragraph 328 seems to have been limited to "finished or unfinished iron or steel *tubes* not specially provided for."

---

[4] A part of the merchandise there involved was held by this court to be classifiable under paragraph 125 of the 1913 act, as claimed by the importer, but the steel bars or grates were held to be structural shapes within the scope of paragraph 104, and we are here concerned with only that part of the holding.

The paragraph as a whole, of course, embraces many other and greatly varied articles.

In the *Simon, Buhler & Baumann* case, *supra*, it was contended on behalf of the Government that none of the articles embraced in the importation were *ejusdem generis* with the articles designated *eo nomine* in paragraph 104 of the 1913 act, and that none of them could be regarded as structural shapes because they were not intended to be used in the construction of buildings or of ships.

In stating its reasons for disagreeing with the contention so made, this court said, *inter alia*:

No evidence was adduced showing or tending to show that the eo nomine designations of paragraph 104 have a meaning in trade and commerce different from that commonly attributed to them by people in general. Neither is there anything in the paragraph or the act which would warrant the conclusion that Congress intended to confine the materials, therein provided for, to such as are used for buildings, ships, and similar erections. Indeed, the fact that the paragraph provides for many articles which may be and are used in the construction not only of ships and buildings, but also in the erecting of such well-recognized structures as bridges, wireless towers, trestles, water towers, derricks, dams, canal locks, and filtration plants, coupled with the fact that it enumerates car-truck channels, a class of materials not designed for use in ships or buildings, convinces us that Congress had in mind more than two kinds of structures when the provision was passed.

Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use. But however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

The filter which is to be made up in part of the materials in controversy is admittedly "a large and ponderous affair" and for its construction it requires frames, plates, centerpieces, heads, posts, channels, and grates of iron or steel, that is to say, materials of great strength capable of sustaining very considerable weights and tensions. A filter of that size made up of such constituents is, in our opinion, a structure as that word is commonly understood and the channels and grates of steel especially formed and designed for use in its construction are "structural shapes" within the meaning of paragraph 104.

It may be noted that while this court, at that early date, was of opinion that it was intended by the Congress that structural shapes should include articles of a more general nature than those used for buildings, ships, and similar erections, it did express the view, quoted by us in our decision in the *Frost Railway Supply Co.* case, *supra*, that "the expression 'structural shapes' does import to people in

general a capacity to sustain heavy weights or to resist great tension or both." This view as to heavy weights was modified somewhat in our later decison in the case of *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038 (62 Treas. Dec. 649), where certain 2 x 2 x ⁵⁄₁₆ inch steel angles which had been classified by the collector as "steel not specially provided for" under paragraph 304 of the 1922 Tariff Act, successor to paragraph 104 of the 1913 act, and forerunner of paragraph 304 of the 1930 act (which paragraph is not involved in the instant case) were held by us to be structural shapes of steel, etc., entitled to classification under paragraph 312 of the 1922 act, forerunner of paragraph 312 of the 1930 act quoted, *supra*, as modified by the trade agreement. In holding in effect that structural shapes were not limited to articles of heavy weight, we quoted from and relied upon matter taken from the Summary of Tariff Information, 1920, furnished by the Tariff Commission for the use of Congress when considering the bill which became the Tariff Act of 1922.

It also was pointed out there that steel angles were designated *eo nomine* in paragraph 312 of the 1922 act; that it had been fully established that those involved had the capacity to sustain *relatively* heavy weights and to resist great tension; and that they were designed to be, and were, used as structural shapes in buildings, derricks, and other structures requiring light sections.

In that case we disagreed with the contention of counsel for the Government that certain language, relative to the phrase "fabricated for use" appearing in paragraph 312, used in our decision in the case of *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079 (54 Treas. Dec. 469), required application of the doctrine of chief or of exclusive use in order to determine whether an article was provided for in paragraph 312 of the 1922 act.

The latter holding was reiterated in our decision in the case of *United States* v. *Julius Blum & Co., Inc.*, 26 C. C. P. A. (Customs) 168, C. A. D. 12.

In the *Exstein Co.* case, *supra*, deformed steel bars used for the reinforcement of articles made of concrete which the collector had classified under paragraph 304 of the 1922 act were held properly classifiable as structural shapes under paragraph 312 of that act. It was said in the course of the decision there:

* * * It is true, the present case presents for consideration an importation which might be considered upon the border line between material such as we have held is covered by said paragraph 304, *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, and structural shapes, as provided for by said paragraph 312. Applying the principles, however, stated in the last cited case as well as in *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust Appls 273, T. D. 37537, there does not seem to be any inherent dificulty in arriving at a satisfactory conclusion.

In the case of *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184 (51 Treas. Dec. 714), steel sheet piling used to form cofferdams and also for making foundations and retaining walls for various structures including bridges, dams, tunnels, levees, docks, breakwaters, etc., which had been classified by the collector under paragraph 304 of the Tariff Act of 1922, forerunner of paragraph 304 of the 1930 act, which is not involved here, was held properly classifiable as structural shapes under paragraph 312 of the 1922 act.

In the decision in that case we quoted much of the court's decision in the *Simon, Buhler & Baumann* case, which has been quoted *supra*, and commented as follows:

> The reasoning thus used is equally applicable to said paragraph 312, which contains practically identical language with said paragraph 104, in so far as the *eo nomine* designation of articles therein is concerned. The reenactment of this paragraph in the Tariff Act of 1922, unchanged, under the familiar rule, is indicative that the Congress knew of and concurred in the interpretation thus placed upon this language.

In the *Frost Railway Supply Co.* case, *supra*, it was pointed out by way of recapitulation that this court had in the past held steel bars or grates, frames, plates, posts, steel sheet piling, deformed steel bars for reinforcing concrete and small (2 x 2 x $\frac{3}{16}$ inch) angles to be structural shapes within the meaning of paragraph 312 of the Tariff Act of 1930 and predecessor paragraphs of the same purport in the 1913 and 1922 acts.

We then cited the following cases in which the articles involved were denied classification as structural shapes.

*Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T. D. 40490, 46 Treas. Dec. 395, involved connecting rods for locomotive drive wheels. We approved their "residuary classification" as miscellaneous manufactures of metal under paragraph 399 of the Tariff Act of 1922, predecessor of paragraph 397 of the Tariff Act of 1930, not here involved.

In the case of *E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240, 55 Treas. Dec. 378, certain plates called "universal mill plates" which had not been dedicated to the making of either columns or posts were held to be merely materials and classifiable under paragraph 304 of the 1930 act, not here involved. The importer's claim was for classification under paragraph 312 of the 1922 act.

The merchandise involved in the case of *Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449, T. D. 44700, 59 Treas. Dec. 602, consisted of checkered or raised diamond-shaped steel floor plates which were held to be classifiable as steel plates, n. s. p. f., under paragraph 304 of the Tariff Act of 1922, rather than "as building forms or structural shapes" under paragraph 312 thereof. The

view was there expressed that the decision was controlled by that in the case of *Hill* v. *R. D. Wood & Co.*, 163 Fed. 51, which arose under the 1897 tariff act and was decided June 18, 1908 by the United States Circuit Court of Appeals of the Third Circuit. The *Amerlux Steel Company* decision is hereinafter adverted to.

In the case of *European Trading Company* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225, 60 Treas. Dec. 735, wire netting used for holding stucco on the sides of structures or buildings, was held by the majority of this court to be classifiable under paragraph 399 of the Tariff Act of 1922 rather than as structural shapes under paragraph 312 of that act. The rule of *ejusdem generis* was applied, the wire netting being held not "of the same class or nature as the articles [beams, girders, joists, etc.] specifically named in paragraph 312." Paragraph 397 of the Tariff Act of 1930 (not involved here) is identical with paragraph 399 of the Tariff Act of 1922. We hereinafter advert to the *European Trading Co.* case in our discussion of the *ejusdem generis* rule.

The merchandise involved in the case of *Otis McAllister & Co.* v. *United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52, consisted of galvanized corrugated iron sheets used for forming walls and roofings. This court affirmed the judgment of the Customs Court holding the merchandise classifiable under paragraph 308 of the Tariff Act of 1930 with duty assessment at seventy-five one-hundredths of one cent per pound, as provided in that paragraph, plus two-tenths of one cent per pound as provided in paragraph 309 of the act on account of the merchandise being galvanized. A claim of the importer that it was classifiable under paragraph 312 of the act as structural shapes was expressly overruled upon two theories: (a) that the sheets were not "designed for use as load carrying members in the building art," and (b) that any strength that might be incorporated in a building by their use was "at best incidental."

In the brief on behalf of the Government certain expressions in the decision of the trial court, with which counsel for the Government do not agree, are quoted, with the statement that they are incidental to "two major and affirmative contentions" which are stated as follows:

1. That the rule of *ejusdem generis* applies to the designation "all other structural shapes of iron or steel" and that the involved casings are not *ejusdem generis* with the articles designated by name in paragraph 312.

2. These casings are not part of the structure as structural shapes uniformly are, but constitute the well hole itself.

Considering the two "major and affirmative contentions" in reverse order, we have to say, first, that we are wholly unable to understand how a hollow cylindrical article which lines a hole can be regarded as the hole which it lines.

As a matter of fact, in the argumentative portion of the Government brief upon this point the distinction between the casing and the hole is stated in a single terse sentence, reading *"The casing is run to protect the hole that has been drilled, to prevent it from caving in."* [Italics supplied by us.] We regard this as an accurate statement (but it may be added that the casing also protects the tube), and disagree with the subsequent statement in the brief that, "To all intents and purposes the assembled casings are the well-hole."

With respect to the rule of *ejusdem generis* the brief for the Government states as point I:

The rule of ejusdem generis applies to the designation "all other structural shapes of iron or steel" and the involved casings are not of the same general class of articles therein named.

This is followed by arguments subdivided into sections designated (a), (b), and (c).

The opening paragraph of section (a) reads:

(a) We consider that it is now settled law that it was the intent of Congress to include within the term "structural shapes" only articles *ejusdem generis* with the articles specifically set forth in paragraph 312. *Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449 [T. D. 44700, 59 Treas. Dec. 602]; *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, [T. D. 45225, 60 Treas. Dec. 735].

It has been hereinbefore stated that the merchandise involved in the *Amerlux Steel Corp.* case, *supra*, which arose under the Tariff Act of 1922, consisted of diamond-shaped steel floor plates and that the decision of it was deemed to be controlled by the decision of the United States Circuit Court of Appeals in the *Hill* v. *R. D. Wood & Co.* case, *supra*, which arose under the 1897 tariff act and which involved merchandise substantially identical with that involved in the *Amerlux Steel Corp.* case, *supra*, upon which we were there passing.

It appears from the decision in the *Hill* v. *R. D. Wood & Co.* case, *supra*, that the paragraphs of the 1897 tariff act there involved were numbers 126 and 135.

The only reference which we made in the *Amerlux* decision to the rule of *ejusdem generis* appears in a paragraph immediately following the statement that the Circuit Court of Appeals affirmed the judgment of the Circuit Court, which reads:

It was evidently held by each of the tribunals passing upon the issue that the merchandise was neither a structural form or shape covered by paragraph 125, nor boiler plate, or other plate *ejusdem generis* therewith, covered by paragraph 126 of said 1897 act. The opinion of the board (now the court) expressly so held. [Italics quoted.]

So, the *ejusdem generis* rule was applied there in a comparison of different types of steel plates, and not in a comparison of "other structural shapes" with beams, girders, etc. named in paragraph 312, *supra*.

Accordingly, the brief on behalf of appellee in the case now under consideration correctly states:

\* \* \* While the *Amerlux* case, *supra*, mentions the rule of *ejusdem generis*, the provision of law to which said rule was there applied was not one for structural shapes but a provision for "boiler plate" and *other plate ejusdem generis therewith*, in Paragraph 126 of the Tariff Act of 1897, the predecessor of Paragraph 307 of the Tariff Act of 1930, which is not in any sense involved in the instant appeal. (Italics quoted.)

The decision in the *Hill* v. *R. D. Wood & Co.* case, *supra*, made no reference to the rule of *ejusdem generis*, nor did the decision of the Customs Court in the *Soule & Co.* case, *supra*, where the merchandise consisted of diamond-shaped steel floor plates which we held not to be structural shapes. The latter might very well have been cited as quite pertinent in the *Amerlux Steel Corp.* case, *supra*, along with the *Hill* v. *R. D. Wood & Co.* case, *supra*.

In the majority opinion [5] in the case of *European Trading Co.* v. *United States*, supra, definitions of *ejusdem generis* were quoted from Anderson's Dictionary of Law as follows:

*Ejusdem generis.* L. Of the same kind or nature; of the same class.

In the construction of statutes, contracts, and other instruments, where an enumeration of specific things is followed by a general word or phrase, the latter is held to refer to things of the same kind as those specified.

It was then said:

In construing the general provision, "all other structural shapes of iron or steel," etc., we think it eminently proper to consider the question as to whether the articles sought to be included within its terms are of the same kind, class or nature as the articles specifically named in the paragraph such as "beams, girders, joists," etc.

This rule of interpretation is not to be regarded as controlling in all instances, *United States* v. *R. F. Downing & Co.*, 17 C. C. P. A. (Customs) 194, T. D. 43645, but it may be controlling where the proper construction of a tariff paragraph is in doubt and where the intent of the legislature is not otherwise more persuasively indicated \* \* \*.

We do not think the wire netting at bar is of the same class or nature as the articles specifically named, and this fact is at least one of the considerations which bring us to the conclusion that it should not be classified under paragraph 312.

Prior to that holding the majority had expressly held, for reasons stated and *without any reliance upon the rule of ejusdem generis*, that the wire netting there involved was not a structural shape within the purview of paragraph 312 of the Tariff Act of 1922, and it seems to us now that what was there said respecting the rule of *ejusdem generis* was *obiter*, or surplusage at most.

A further argument upon the matter of *ejusdem generis* in the brief for the Government is based upon an expression in the decision of the

---

[5] The writer of the instant opinion is the only survivor of the five judges who participated in the decision of *European Trading Co.* case, and he dissented, but did not discuss the rule of *ejusdem generis* in his dissenting statement.

Customs Court in the case of *The Frost Railway Supply Co.* v. *United States*, 25 Cust. Ct. 170, C. D. 1281, which the brief quotes as follows:

> The body of decisions on this phase of the case clearly indicates that the statutory term "structural shapes" has reference to metal structural members capable of giving the greatest strength with the least weight, especially adapted to structural purposes, and which are "of the same kind, class or nature as the articles specifically named in the paragraph, such as 'beams, girders, joists, etc.' * * *."

That case came before us on appeal and we affirmed the judgment of the trial court for reasons fully stated, but no hint was given that we regarded the rule of *ejusdem generis* applicable to any phase of the controversy.

It may be said at this juncture that in the brief for appellee it is contended:

> Not only are the casings at bar structural shapes *per se*, but they are also *ejusdem generis* with the other articles specifically named in Paragraph 312, *supra*.

In our opinion the soundness of that contention depends upon the articles proper for comparison. Conceding, without holding, that the casings here involved are not *ejusdem generis* with "beams, girders, joists, angles, channels, car-truck channels, tees, columns, and posts, or parts or sections of columns and posts, and deck and bulb beams," all of which are embraced within the term "structural shapes," we may not overlook the fact that Congress realized that there were and are "other structural shapes" of iron and steel and that it made provision for them. We do not have to go outside the paragraph to ascertain that "other structural shapes" are as fully provided for in paragraph 312 of the Tariff Act of 1930 as are beams, girders, or any other of the several articles designated *eo nomine* therein, but it is frequently more difficult to determine what constitutes a structural shape than it is to determine what constitutes a girder or a tee. The courts have fully recognized this in decisions from which quotations have been made herein, the latest being from *The Frost Railway Supply Co.* case, *supra*, where we said, "*No precise definition, * * * can be laid down to cover the term* [structural shapes], *each case depending on its own record for determination.*" (Italics new here.)

Counsel for the Government here seek to have the court apply the rule in a negative way. We cannot very well say what is *not* a structural shape until what *is* a structural shape shall have been determined.

We think it would be impossible, under the phraseology adopted by the legislative branch of the Government in the Tariff Act of 1930, for the courts to lay down a rule and declare that such rule settled the questions of what is and, therefore, what is not a structural shape within the meaning of paragraph 312, *supra*.

However, deductions may be drawn from decided cases, many of which are herein cited, covering at least some of the characteristics

.which an article must possess in order to be properly classifiable as a structural shape and there is, doubtless, room for resort to the rule of *ejusdem generis* for purposes of comparison, but it should be borne in mind that, with the exception of what we regard as *obiter* in the majority opinion in the *European Trading Co.* case, *supra*, no case involving "structural shapes" such as those contemplated by that phrase in paragraph 312, *supra*, has been cited (nor has any been found) in which any appellate [6] court rested a decision upon the ground that the article involved should be excluded from classification under the paragraph by reason of the rule of *ejusdem generis*.

Application of the *ejusdem generis* rule was sought by counsel for the Government in the *Simon, Buhler & Baumann* case, *supra*, in the same manner that it is sought here, but this court, as then constituted, denied it. The measure of its application in the *Amerlux Steel Corp.* case, *supra*, has been hereinbefore detailed and need not be repeated.

In its decision in the instant case, the trial court compared the involved merchandise with the sheet piling involved in the *Frank* case, *supra*, and said of certain phraseology used by the court in the decision of that case:

> The language above quoted fits the present case with singular precision. Adapting the language of the court to the facts in the present case, the evidence clearly shows that casings are made "to combine the greatest strength with the least weight," and are used practically exclusively "in erecting structures"; they are used under ground and are, with few exceptions which are unimportant, "permanently installed in structures."
>
> Expert engineers of many years experience have testified that in their opinion casings are structural shapes, and we are clearly of the opinion that if sheet piling which is used in the construction of bridges, dams, tunnels, levees, docks, breakwaters, and so forth, properly belongs in the class of structural shapes, it logically follows that casings which are used primarily in the construction of oil wells are likewise structural shapes. The fact of their use in isolated instances in the construction of sulphur wells, water wells, bridges, and cranes is added proof of their quality, design, and character which constitute them as belonging in the category of structural shapes.

In the brief for the Government the view is expressed that the court erred in that statement. We do not think so. The comparison seems to us to be apt and fair.

Subsection (b) under point I of the Government brief is devoted to a short discussion of the testimony of three of the six witnesses called on behalf of the importer. Each of the three, when asked, expressed an opinion to the effect that the casings were structural

---

[6] In the brief for the Government attention is directed to the decision of the Board of United States General Appraisers (now the Customs Court) *in re protest of Geo. W. McNear et al.*, T. D. 24602, G. A. 5395, 6 Treas. Dec. 673, rendered July 30, 1903, in which it was held that certain plate or sheet steel plates were not *ejusdem generis* with the class of articles enumerated in paragraph 125 of the 1897 act which was quite similar to paragraph 312 of the 1930 act. It is thought that that tribunal's decision in the case of *Simon, Buhler & Baumann v. United States*, affirmed by this court (see 8 Ct. Cust. Appls. 273, T. D. 37537) had the effect of overruling that decision. The latter case arose under the 1913 tariff act.

shapes. The brief points out that this is opinion evidence and suggests that the qualifications of the witnesses "were insufficient" to establish a finding in accord with that opinion.

We see no reason for any elaborate discussion of this particular phase of the case. Of course, the courts are not bound by opinion evidence. The value of the testimony adduced on behalf of the importer here, as we view it, lies in its showing of the precise nature and use of the merchandise illustrated by the physical article embraced in collective exhibit No. 1 which is itself a very potent witness. Also, it did no harm, to say the least, to have the court advised by witnesses who know—and the witnesses here did know—respecting the nomenclature used in trade and commerce, the usages of trade and commerce being of especial importance in customs law.

The first paragraph of subsection (c) under point I in the brief for the Government reads:

(c) Casings are not designed to support any portion of the weight of a building. Standing alone with nothing else added or attached to them, the casings are the building or structure itself and are not of the same kind, nature or class as beams, girders, joists, and angles.

Already we have indicated our view that an article is not excluded from classification as a structural shape merely because it is not of the same kind, nature or class as a beam, or a girder, or a joist, or an angle,—a view which we regard as being in full harmony with many decided and cited cases—and we now state our belief based upon the phraseology of the paragraph that it was never intended by the Congress that an article should be excluded from classification under the provision in paragraph 312, *supra*, merely because it may not be designed to support the weight of a building. The casing made up of units such as those here involved, sunk, usually deep, into the earth through varying strata of soil, clay, sand, rock, etc., must resist great external pressure and in that respect protect the bored hole against destruction by forces which at some points doubtless are of as great weight as that part of a building which rests upon a beam, girder, joist, or angle. As imported, the units do not constitute the structure. To do that they must be joined together end to end in much the same manner as the beams which form the frame work of the walls of buildings are joined.

In view of the fact that the imported units are parts shaped for use in forming oil well casings, which casings, in our opinion, are structures within the purview of paragraph 312, we concur in the decision of the Customs Court and the judgment appealed from is *affirmed*.

JACKSON, J., sat for COLE, J., disqualified.