UNITED STATES *v.* HENRY L. EXSTEIN Co., INC. (No. 3086)[1]

[1] T. D. 43079.

United States Court of Customs Appeals, November 19, 1928

*Charles D. Lawrence,* Assistant Attorney General (*Kenneth G. Osborn,* special attorney, of counsel), for the United States.
*Colladay, Clifford & Pettus* (*Henry B. Morrow, Edward F. Colladay, Edward Clifford, J. P. Crawford* and *Frank L. Lawrence* of counsel) for appellee.
*Lamb & Lerch* (*John G. Lerch* of counsel) *amici curiæ.*

[Oral argument October 10, 1928, by Mr. Osborn, Mr. Morrow, Mr. Crawford, Mr. Lawrence, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

William H. Masson entered certain so-called deformed steel bars at the port of Baltimore, which were duly classified by the collector there as steel bars, under paragraph 304 of the Tariff Act of 1922. The appellee protested, claiming the same to be dutiable as structural shapes of steel, under paragraph 312 of the same act. The matter was duly heard by the United States Customs Court, and judgment was entered there sustaining the protest and directing a reclassification accordingly. From that judgment the Government has appealed, alleging that the original classification by the collector was correct and that the court below erred in not so holding.

The competing paragraphs are as follows:

PAR. 304. Steel ingots, cogged ingots, blooms and slabs, by whatever process made; die blocks or blanks; billets and bars, whether solid or hollow; shafting; pressed, sheared, or stamped shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping; hammer molds or swaged steel; gun-barrel molds not in bars; alloys not specially provided for used as substitutes for steel in the manufacture of tools; all descriptions and shapes of dry sand, loam, or iron molded steel castings; sheets and plates and steel not specially provided for; all of the foregoing valued at not over 1 cent per pound, two-tenths of 1 cent per pound; valued above 1 cent and not above 1½ cents per pound, three-tenths of 1 cent per pound; valued above 1½ and not above 2½ cents per pound, five-tenths of 1 cent per pound; valued above 2½ and not above 3½ cents per pound, eight-tenths of 1 cent per pound; valued above 3½ and not above 5 cents per pound, 1 cent per pound; valued above 5 and not above 8 cents per pound, 1⁷⁄₁₀ cents per pound; valued above 8 and not above 12 cents per pound, 2½ cents per pound; valued above 12 and not above 16 cents per pound, 3½ cents per pound; valued above 16 cents per pound, 20 per centum ad valorem: *Provided,* That on steel circular saw plates there shall be levied, collected and paid an additional duty of one-fourth of 1 cent per pound.

PAR. 312. Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, deck and bulb beams, and building forms, together with all other structural shapes of iron or steel, not assembled, manufactured or advanced beyond hammering, rolling, or casting, one-fifth of 1 cent per pound; any of the foregoing machined, drilled,

punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting, 20 per centum ad valorem; sashes, frames, and building forms, of iron or steel, 25 per centum ad valorem.

The imported material consisted of bars made from new billet steel, in part, approximately $1\frac{1}{8}$ inches square and 60 feet in length, and in part of round bars, 40 feet in length and three-eighths and one-half inch in diameter. These bars were rolled and conformed to the standards established by the American Society for Testing Materials. Upon their respective surfaces were ridges and protuberances so placed and spaced as to make them suitable for holding when embedded in concrete construction. They were completely manufactured. The principal use of this material, as shown by the testimony, was for reinforcement for concrete. A minor use of the same is shown by the record for making ornamental grill and other iron work, but it is not contended that this is a major, or even an important, use of the product. It is not used for forging or machine work because of its deformations. It is also disclosed by the evidence that this material is used in conjunction with concrete in making floors conduits, bridges, walls, and, in fact, practically every structure where concrete is used. The testimony further discloses that where used in a building, the plans and specifications prepared by the engineer or architect specify the location, size, and strength of such reinforcing material, and that when so used, the ends of the bars are usually bent in such a form that they can be anchored by means of stirrups, or otherwise, to the wall columns or laterals of the building, and, after having been so placed, are surrounded with concrete and become a permanent part of the building, and can not be removed without endangering the stability and strength thereof. If is further shown that these are used in all buildings of steel construction, wherever concrete work is needed, and are also used as a reinforcement in concrete buildings or structures where no steel framework is used. The bending of the ends for attachment to the other members of the building is done by workmen, usually in the progress of construction.; when this material is imported it is straight, without any such finishing. When a structure in which such material is used is completed, the said material assists in carrying both the dead and live loads of the building, has the capacity to resist great tension and compression, contributes to the stability of the structure, and becomes an integral part of the skeleton of the same. The imported material has not been assembled, manufactured, or advanced beyond hammering, rolling, or casting.

The only question for our decision is whether the court below erred in holding, under this proof, that said material constitutes "structural shapes" of steel.

We incline to the view there was no error in so holding. It is true, the present case presents for consideration an importation which might be considered upon the border line between material, such as we have held is covered by said paragraph 304, *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, and structural shapes, as provided for by said paragraph 312. Applying the principles, however, stated in the last cited case as well as in *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, there does not seem to be any inherent difficulty in arriving at a satisfactory conclusion.

In the *Simon, Buhler & Baumann* case, *supra*, the question for decision was whether certain channels and grates of steel, parts of a brewery filter, were manufactures of metal, under paragraph 167, or structural shapes of steel, under paragraph 104 of the Tariff Act of October 3, 1913. In deciding the matter, Smith, J., speaking for the court, said:

Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose, it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains, and artificially joined together for some special use. But, however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

In *United States* v. *Frank, supra*, the classification of certain sheet-steel piling was involved. It was classified by the collector as steel, not specially provided for, under paragraph 304 of the Tariff Act of 1922, and was claimed to be dutiable as structural shapes, not advanced, under paragraph 312 thereof. A short quotation from the opinion in that case shows the use of the sheet-steel piling:

From their testimony it appears that such material is commonly used in the construction of dams, including core walls after installation, for building foundation work, including retaining walls and foundation piers, for dock walls, for elevator shafts, and for breakwaters. In using the piling in foundation work for buildings, it is shown that the piling is usually driven on both sides of the space intended for the foundation, the earth is then removed, and the space thus left is filled with concrete. When so used it appears that the steel piling is usually not afterwards removed, and remains as a reinforcement of the concrete structure. It is also sometimes embedded in concrete and thus forms a part of the foundation.

After reviewing the various authorities, this court then quoted with approval the definition of "structural shapes" found in *Birtwell* v. *Saltonstall*, 39 Fed. 383:

It appears from the evidence that, speaking in a broad commercial sense, the term "merchantable iron" is limited to rounds, squares, and flats; that anything

else, such as beams, girders, angles, etc., having any special shape, and intended to be used in the form of a structure, is a structural shape.

The court then also cited with approval the *Simon, Buhler & Baumann* case, *supra*, demonstrated that the construction in the cases cited was in conformity with the ordinary meaning of the statutory terms used, and concluded:

> The sheet piling in the case at bar plainly comes within the definition first above given. It is so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures. While much of it is used under ground, lexicographers agree that a structure is not confined to that part of a building which appears above the ground. It is argued that the use of such piling being temporary, it is not a true structural material. Without attempting to foreclose discussion on this point, it is sufficient to suggest that the testimony shows that at least one-half of this piling is permanently installed in structures, where it forms a very essential and necessary part. If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification.

> \*       \*       \*       \*       \*       \*       \*

> An analysis of the evidence in this record leads to the conclusion that for many years sheet steel-piling has been bought and sold in the markets of the United States precisely as other structural steel shapes, and that at times some of such other more well-known structural shapes have been used for precisely the same purposes as this sheet piling. As was said in the Revillon Frères case, this record shows that for years this material has been definitely, uniformly, and generally treated and used by the steel trade as structural shapes, and that prior to the approval of the Tariff Act of 1922 trade usage and custom had so far crystallized as to give to the term "structural shapes," a definite, uniform, and general significance broad enough to include the steel-sheet piling in controversy.

Much the same comment might be made of the material imported here. It is, and has been for years past, bought and sold in the markets of the United States and has been used precisely as other structural shapes of steel. It performs the same functions when so in use. The same impelling legislative reason which caused beams, girders, joists, and the other steel products eo nomine specified in said paragraph 312 to be placed there would equally apply to this material. Manifestly, some other forms and shapes of steel were in contemplation than these specifically mentioned, else the words "all other structural shapes of iron or steel" would not have been used.

It is argued that these deformed bars are bought and sold in bulk, as other building materials, are not required to be fabricated to fit any particular job, and should hence be treated as materials. The same might be said of the other steel products mentioned in said paragraph 312. It will be observed that the paragraph levies a certain rate of duty upon said products when not "assembled, manufactured, or advanced beyond hammering, rolling, or casting," and a higher rate when "machined, drilled, punched, assembled,

fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting." Obviously, these materials may be and no doubt are imported into this country in bulk, as stock goods, not at all ready for their final use. What does the statute mean, for example, when it says "fabricated for use?" Plainly, that there may be such products, covered by this paragraph, which are not fabricated for use. It is well within reason that I beams, for instance, may be ordered from stock and be punched, fitted, and assembled on a construction job. If so, wherein does this differ from a reinforcing bar, which must be fitted for its use by, possibly, cutting or having its ends turned over? No difference, in effect, is apparent. If a steel product is used as a structural shape of steel, it is not removed from that classification because it requires fitting and fabricating to a degree before it is used.

It is claimed by the Government that the commercial proof in the case establishes that the articles of importation are "bars" and not "structural shapes." We have examined the record in this particular with great care. Five witnesses were called by the Government and testified upon this subject. These witnesses, who appeared to be well qualified to speak, stated in substance that on and prior to September 22, 1922, there was a definite, uniform, and general trade meaning for the term "bar," and that such meaning included the merchandise in question; that there was also a definite, uniform, and general meaning for the term "structural shape," and that the same did not include the said merchandise. All of these witnesses further testified, however, that the imported material was never known, ordered, or sold as "bars," but as "deformed bars," or "reinforcing bars," or "concrete bars," and according to certain specifications made by the purchasers.

The court below properly held that this was not sufficient proof of commercial designation to remove the merchandise from the classification of "structural shapes" into that of "bars." While not exactly parallel, a somewhat similar situation existed in *United States v. Frank, supra*, where, in commenting upon evidence of commercial designation in that case, we said:

Ordinarily, proof of commercial designation is adduced in the effort to remove an article from a provision where it is *eo nomine* designated to some other tariff designation or to bring it within a designation which would not otherwise include it. But here the attempt is made to remove an article from a generic designation by proof that it is not known by the generic designation but by a specific name differing from the generic designation. Such proof is not ordinarily satisfactory.

So, in this case, if the goods are, in fact, structural shapes they can hardly be said to be removed from such classification and into the classification of "bars" by proof that they are commercially known as "deformed bars" or by other similar designations.

In conclusion, it is argued that if the deformed bars in issue here are to be treated as structural shapes of steel, then all steel which goes into a structure and becomes a part thereof must be so treated. This does not follow, and this opinion should not be taken as so holding. The classification of such steel will, in each case, depend upon its designation, character, and use, whether it ought, properly, to be considered as material or structural shapes and forms.

For the reasons suggested, the judgment of the court below is *affirmed*.