(C. D. 201)

Ivan B. Dahl, Inc., et al. v. United States

## United States Customs Court, Second Division

(Decided August 21, 1939)

*Pickrell & McDonald* (*Daniel P. McDonald* and *Eugene R. Pickrell* of counsel) for the plaintiffs.

*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

*William Whynman, amicus curiae.*

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of Norfolk, Va., brought to recover certain customs duties alleged to have been improperly exacted on particular importations of horse or mule shoes with the heels turned. Duty was levied thereon at the rate of 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for. It is claimed that said articles are properly dutiable at one-fifth of 1 cent per pound under the provision in paragraph 333 of said act for "Common horse, mule, or ox shoes, of wrought iron or steel." Said latter paragraph reads in full as follows:

PAR. 333. Common horse, mule, or ox shoes, of wrought iron or steel, one-fifth of 1 cent per pound; horse, mule, or ox shoes, punched, drilled or tapped, of wrought iron or steel, for use with adjustable wrought-iron or steel skid calks, and solid drop-forged calked shoes of wrought iron or steel, 1 cent per pound.

A sample of the imported merchandise was admitted in evidence as Exhibit 1. Two witnesses testified in behalf of the plaintiffs and four witnesses for the Government.

The first witness for the plaintiffs, Leonard Anderson, vice president of Ivan B. Dahl, Inc., testified that he had sold merchandise similar to Exhibit 1 at wholesale during the year 1935 under the name "common horseshoes or mule shoes."

On cross-examination, he testified as follows:

X Q. Did you bring any orders with you, showing that you sold them under that name?—A. No.

    *      *      *      *      *      *      *

X Q. You never used the name "common" in calling a horseshoe, did you?—A. No.

The second witness, Andrew Kingsbury, testified that he had sold horseshoes similar to Exhibit 1 to wholesalers throughout the eastern half of the United States; that he classified under the term common horseshoes every horseshoe made by the rolling process, which would include horseshoes similar to those represented by Exhibit 1; that he had testified before this court in the matter of protest 751022–G; and

that the horseshoes in that case were similar in all material respects to those represented by Exhibit 1 in the instant cases.

At this juncture counsel for the plaintiffs moved to incorporate herein the record in protest 751022–G, together with the exhibits therein, which motion was denied by the court on the ground that although the merchandise in the two cases was similar the issues in each instance involved were not the same, in that different competing paragraphs of the tariff act were in question.

The witness then produced a catalog issued by the Standard Horse Shoe Co., manufacturers of horse and mule shoes, with offices at Boston and a factory at South Wareham, Mass., which catalog was admitted in evidence as Illustrative Exhibit A, over the objection of counsel for the Government.

The witness testified that an illustration of a horse shoe similar to Exhibit 1 appears on page 30 of said catalog, under the name of "Standard Short Turned Heel"; that that particular kind of horse-shoe had been sold in the United States for the past 20 years as a common horseshoe.

A sample of a drop-forged horseshoe was then admitted in evidence as Illustrative Exhibit B, and a sample of a shoe known as a punched shoe, with heels threaded for adjustable calks, was admitted in evidence as Illustrative Exhibit C.

The witness then testified that he had worked for 7 years as a blacksmith and horseshoer and that based on his experience Exhibit 1 was a common horseshoe.

On cross-examination the witness testified that in selling to whole-sale purchasers he always referred to a shoe like Exhibit 1 as a common horseshoe; that he had not brought with him any orders; that he had received orders for a common horseshoe; that Illustrative Exhibit B, known in the trade as a drop-forged shoe, was a common horseshoe; that he had sold horseshoes similar to that depicted on page 30 of Illustrative Exhibit A; that if he received an order for turned-heel horseshoes he would be able to fill the same; and that he never received a written order calling for a definite amount of common horse-shoes; and that the word "common" is never used in ordering in the trade.

On redirect examination he testified that in commercial transactions involving shoes similar to Exhibit 1 the word common is under-stood in the trade; that when he stated that Exhibit 1 and Illustrative Exhibit D were the same type of shoe he did not mean that the two shoes were identical, but that they were both common horseshoes in that they were forged in the one piece and nothing else placed upon them, and that Exhibit 1 was a rolled horseshoe.

On recross-examination he testified that there was no such article known as a "flat shoe"; that there was a horseshoe without a turned

heel, which is known as a plain shoe. Being shown a shoe, which was admitted in evidence as Illustrative Exhibit D, he testified that said shoe was a plain mule shoe; that Illustrative Exhibit D and Exhibit 1 represented the same type of horseshoe; that shoes known as bronco cowboy shoes and countersunk shoes are different types of common horseshoes; that any horseshoe that is not a drop-forged shoe, or a shoe with heels punched for adjustable calks, is a common horseshoe; and that a calked shoe and a turned-heel shoe are not the same thing.

The first witness for the Government, Cleveland C. Huyler, vice president of Vought & Williams, testified that since 1923 he had been engaged in the sale of horseshoes at wholesale in the States of New York, New Jersey, and Connecticut; that he had sold shoes similar to Exhibit 1 under the name turned-heel shoes; that the term common horseshoes is used in the trade; that in his experience a common horseshoe was a shoe without any heel, toe, or calks; that Illustrative Exhibit D was known as a common mule shoe and that a similar shoe, fitted for a horse, would be a common horseshoe (a sample of which was admitted in evidence as Illustrative Exhibit E); that he had sold different types of common horseshoes, such as light, extra light, heavy, city, long heel, light long heel; that in all such cases where common horseshoes were ordered the seller always furnished a flat shoe similar to Illustrative Exhibit E; that whenever a shoe like Exhibit 1 is sold it is sold under the name of a turned-heel shoe.

On cross-examination the witness testified that the decision of this court in the instant case would affect the business of his concern, in that if decided in favor of the Government it would stop some of the competition of foreign shoes; that his concern bought material from the Phoenix Horse Shoe Co.; that he probably had received orders for so many kegs of common horseshoes; that where a customer ordered a common horseshoe the witness would understand he wanted a plain, flat shoe.

On redirect examination he testified that a calked heel and a turned-heel shoe were the same thing.

The second Government witness, Charles T. Buraus, a salesman in the employ of the Kennedy, Foster Co. of New York City, testified that he had sold horseshoes to horseshoers in the States of New York, New Jersey, and Connecticut; that he had sold shoes similar to Exhibit 1 under the designations of calked shoes, calked and heeled shoes, or turned shoes, but never as common shoes; that Illustrative Exhibit D is a common horse or mule shoe, and is a flat shoe; that such shoes are sold according to weight, as extra light, light, medium, heavy, and extra heavy; that if he received an order for so many kegs of light horseshoes he would fill such order by delivering common horseshoes, but not with turned-heel or calked-heel shoes; that if he received an

order for so many kegs of heavy horseshoes he would fill the said order by delivering flat shoes, but never by delivering turned-heel or calked-heel shoes; that he had been a blacksmith for 20 years, during which period he bought horseshoes; that when he ordered horseshoes the order was always filled by the delivery of flat shoes; that if he wanted turned-heel shoes he would order turned-heel shoes; that shoes with heels or toes, or both, are never common horseshoes, and that many blacksmiths turned the shoes themselves.

On cross-examination he testified that he bought material from the Phoenix Horse Shoe Co.; that his company was affected by the competition of imported foreign horseshoes, and to that extent was interested in the outcome of the instant case; that if a customer sent in an order for common horseshoes the witness would not know the type of shoe to deliver until he was given further information.

The third Government witness, Gustave Hagedorn, testified that he had been a horseshoer for 40 years, being at present in the employ of the New York City Police Department in that capacity; that he had never used horseshoes similar to Exhibit 1 and that he had bought horseshoes similar to Illustrative Exhibit D under the name of plain shoes and had turned them himself.

The fourth and last witness for the Government, Thomas P. Mack, sales manager in the employ of the Phoenix Manufacturing Co., manufacturers of horse and mule shoes, testified that he had sold horseshoes in wholesale quantities from Chicago, west to the Pacific Coast, and throughout the Southern States; that he had sold horseshoes similar to Exhibit 1 in wholesale quantities as turned-heel horseshoes; that he had never sold a horseshoe under the name common horseshoe; that he had sold shoes similar to Illustrative Exhibit D as plain or flat horse or mule shoes; that he had never sold shoes like Exhibit 1 as common horseshoes; and that in his opinion a common horse or mule shoe was a plain, flat shoe like Illustrative Exhibit D or Illustrative Exhibit E.

On cross-examination he testified that his company was the largest manufacturer of horseshoes in the United States; that its interest would be affected by the outcome of the instant case; that he did not recall ever seeing an order calling for common horseshoes; that if a customer desired a particular kind of horseshoe he would have to describe it in two ways, namely, by size and pattern.

At the conclusion of this witness' testimony, it was stipulated and agreed by and between counsel for the respective parties that if Rudolph R. Wendt, E. Julius Cappelmann, and Christopher I. Lennon were called as witnesses on behalf of the Government their testimony would be the same as that of the four previous witnesses, subject to the same objections of counsel and rulings thereon by the court.

Upon this record it is evident that there is no proof of commercial designation of the words "Common horse, mule, or ox shoes" as they appear in said paragraph 333 of the Tariff Act of 1930. All of the witnesses, either on direct or cross-examination, seem to be agreed that horseshoes are never ordered or delivered as common horseshoes.

Moreover, if counsel for the Government had contemplated proving commercial designation, the method pursued has utterly failed to comply with the requirements, as repeatedly laid down by the Court of Customs and Patent Appeals. In the case of *Passaic Worsted Co., et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916, that court, after quoting certain testimony purporting to be evidence of commercial designation, said:

> Such testimony does not establish commercial designation, as we have had occasion many times to state. *United States* v. *Exstein Co.*, 16 Ct. Cust. Appls. 328, T. D. 43079; *United States* v. *Schade & Co.*, 16 Ct. Cust. Appls. 366, T. D. 43092; *Hampton, Jr.* v. *United States*, 12 Ct. Cust. Appls. 490, T. D. 40695; *United States* v. *Schoemann & Mayer*, 17 C. C. P. A. 349, T. D. 43778.
>
> At the risk of unnecessary reiteration, we repeat a suggestion as to this kind of evidence frequently heretofore made by us. If, in the case at bar, it was sought to establish commercial designation of the imported machines as textile machinery, before attempting to do so it must be legally admitted that they have a commercial designation which differs from their common designation and that, under the common designation, they are not textile machinery. Otherwise, and if they are commonly known as textile machinery, no occasion for proof of commercial designation exists. Then, having admitted this necessary legal premise, the next inquiry must be: "By what name are these articles designated uniformly, generally, and definitely in the trade wherever they are bought and sold?" If, to such an inquiry, the witness can respond that they are so designated as textile machinery, the evidence is competent and tends to prove commercial designation. * * *

Manifestly, in the instant case there is no evidence that the words, "Common horse, mule, or ox shoes," have a commercial meaning different from their plain and ordinary meaning. Moreover, there is no evidence in the record that any article other than the imported horseshoe is uniformly, generally, and definitely designated in the trade and commerce of the United States, wherever it is bought and sold, as a common horseshoe. The very fact that the Congress used the word common would seem to imply that only the plain and ordinary meaning of the word horseshoe was contemplated and intended. The question of commercial designation not being in issue, the only issue to be decided is: What is the plain and ordinary meaning of the words "common horseshoe"?

As we stated in the case of *New York Horse Shoe Co., Inc.* v. *United States*, T. D. 49223, 72 Treas. Dec. 486, much light is thrown on the intent of the Congress in enacting paragraph 333 of the Tariff Act of 1930 by a statement appearing on page 717 of Volume 1 of the Summary of Tariff Information, 1929, an official publication which was

before the Committee on Ways and Means of the House of Representatives when that paragraph was being framed. This statement reads as follows:

* * * The Act of 1922 groups all solid drop-forged shoes and shoes prepared for use with adjustable calks under one rate and all the rest, which are referred to as common shoes, under another and lower rate.

In a brief submitted herein by the *amicus curiae*, in referring to said statement in the Summary of Tariff Information, and our comment thereon, occurs the following statement:

The foregoing statement made by this court, no doubt, is based upon the principle of legislative sanction of judicial interpretation. It is respectfully submitted that that rule of construction does not extend to statements or legal opinions by the Tariff Commission as the Tariff Commission, under the law creating it, is not charged with the interpretation of the law.

Although this statement of counsel may be true, nevertheless, it is equally true that in ascertaining the intent of the Congress the Supreme Court and our appellate court have in numerous cases adverted to the legislative history of a particular paragraph, as shown by statements made by the United States Tariff Commission and to other material contemporary data. *Hampton, Jr., & Co. v. United States*, 12 Ct. Cust. Appls. 490, T. D. 40695; *United States v. Stone & Downer Co. et al.*, 16 id. 82, T. D. 42732; *United States v. Bassichis Co. et al.*, id. 410, T. D. 43133; *United States v. D. L. Moss & Co.*, 22 C. C. P. A. 249, T. D. 47159; *Brecht Corp. v. United States*, 25 id. 9, T. D. 48977; *American Import Co. v. United States*, id. 231, T. D. 49337; *United States v. Stone & Downer Co.*, 274 U. S. 225; *United States v. Shreveport Grain & Elevator Co.*, 287 id. 77.

In the case of *United States v. D. L. Moss & Co., supra*, in discussing the legislative history of paragraph 713 of the Tariff Act of 1930, the court said:

It is evident, we think, from the quoted excerpts from the Summary of Tariff Information, and from the report of the Committee on Ways and Means of the House of Representatives, that the term "dried egg albumen" was intended by the Congress to include all "dried egg albumen" whether dried by the "spray", or other process, and whether imported in the form of powder or otherwise. * * *

In our opinion the Congress intended, in enacting paragraph 333, to include therein all kinds of horse, mule, or ox shoes of wrought iron or steel, and to rate them for duty according to classes. The paragraph provides for three classes of horse, mule, and ox shoes. First, those which are punched, drilled, or tapped for use with adjustable wrought-iron or steel skid calks; second, solid drop-forged calked shoes; both of which classes were to pay a duty of 1 cent per pound; and, third, common hores, mule, or ox shoes, including, as stated in the Summary of Tariff Information, all other horseshoes of wrought iron or steel not specially provided for in the paragraph, including

horseshoes with turned heels, which would pay a duty of one-fifth of 1 cent per pound.

It appears from the record in the instant case that common, ordinary horse shoes come to the blacksmith either in the form of a perfectly flat shoe, the heels of which the blacksmith turns himself, or in the form of a shoe the heels of which have been turned in the process of rolling the horseshoe. In our opinion both of these horseshoes are common horseshoes in the plain and ordinary meaning of the words, and it is inconceivable that the Congress could have intended that a common and ordinary horseshoe which simply has its heels turned in the manufacturing process should be excluded from paragraph 333 and relegated for tariff classification to paragraph 397 at a very much higher duty. The fact that the Congress, in paragraph 333, has specially provided for certain horseshoes which have been considerably advanced beyond having the heels thereof merely turned, makes it entirely unlikely that it was the purpose of the lawmakers unduly to assess horseshoes with merely turned heels and to exclude them from paragraph 333.

On the established facts and the law applicable thereto, we hold that the horse or mule shoes in question are properly dutiable at the rate of one-fifth of 1 cent per pound, under the provision in said paragraph 333 for "Common horse, mule, or ox shoes," as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.