(C.D. 2090)

INTER CONTINENTAL EQUIPMENT Co.
ROHNER GEHRIG & Co., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 4, 1959)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill* and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation of merchandise described on the consular invoice as "anchorages" was classified by the collector of customs as articles in chief value of steel, and duty was imposed thereon at the rate of 22½ per centum ad valorem pursuant to the provision in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

The so-called "anchorages" are used exclusively in the construction industry for prestressing concrete members, and it is the claim of plaintiffs that the articles are more specifically provided for as structural shapes in paragraph 312 of said act (19 U.S.C. § 1001, par. 312), as modified by the Torquay Protocol of said General Agreement, 86 Treas. Dec. 121, T.D. 52739, and dutiable at the rate of 7½ per centum ad valorem.

Samples representing the merchandise were received in evidence as exhibit 1 and illustrative exhibit 2. As illustrative exhibits 3 and 4, there were received in evidence illustrations of the use to which the imported merchandise was applied.

The pertinent text of the competing statutes is here set forth:

Paragraph 397, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles or wares not specially provided for, whether partly or
   wholly manufactured:

\*        \*        \*        \*        \*        \*        \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer :

\*      \*      \*      \*      \*      \*      \*

Other (except slide fasteners and parts thereof) __ 22½% ad val.

Paragraph 312, as modified by the Torquay protocol of said general agreement, *supra:*

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel :

\*      \*      \*      \*      \*      \*      \*

Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 7½% ad val.

Two witnesses were called, both of whom testified on behalf of the plaintiffs.

The first witness, Hans Landolt, testified substantially as follows: He is treasurer and manager of Inter Continental Equipment Co. and identified exhibit 1 as representing the merchandise, invoiced as "1,000 anchorages 12/5 complete," and illustrative exhibit 2 as the same type of merchandise but larger in size. After importation, the merchandise is sold to general contractors and civil engineering firms who are engaged in construction work.

Plaintiffs' second witness, Eugene Smith, testified that he was employed as chief field engineer for the Freyssinet Co., a consulting engineering firm engaged in the design, construction, and supervision of prestressed concrete structures. The anchorages represented by exhibits 1 and 2 are also referred to as cones consisting of two sections. The larger of the two is the female section which is made by placing two coiled steel pieces in a mold and casting concrete around them. The smaller section, referred to as the male section, consists of a steel tube with wire mesh having concrete cast about it.

The merchandise in controversy is used in the construction industry for the purpose of introducing compression into concrete members, the members being strengthened by the compression created by the cones. They are in general use in the construction of dams, bridges, buildings, and other concrete structures, being employed exclusively in the construction industry.

The witness, Smith, described the method of using the cones in the construction of a bridge substantially as follows: When the forms for a bridge are put into position, a rubber hose is placed lengthwise

in the center of the forms. Concrete for the bridge is then poured into the forms, the rubber hose providing a longitudinal hole which runs throughout the length of the bridge through the concrete member. A special high-tension wire cable is introduced through the hole made by the rubber hose and passes through the female section of cones, such as exhibits 1 and 2, which are fastened to the ends of the concrete member. Hydraulic pressure is applied to the cable so that it is placed in tension. The male sections of the cones are driven into the female sections and act as wedges which hold the cable under tension. The function of the cones is to retain that stress and transmit compression to both ends of the concrete member. The same basic principle is applied in the use of cones in the construction of a building. The force exerted on a cone the size of exhibit 2 may be as much as 65 or 70 tons, while on exhibit 1 there would be about 35 tons. It appears that concrete members do not have the capacity to resist tensile stresses. In other words, any force tends to pull the concrete apart. By prestressing the concrete with the use of cones, the concrete member is placed under a compressive force which enables it to resist the subsequent effect upon the concrete when it is subjected to tension. It is the cones which put the concrete in compression.

It appears further from Smith's testimony that, after the cones are placed in position and the cables placed under tension, the cones are covered with concrete and the cables which extend through the cones are cut off. The cones then become a permanent part of the structure and cannot be removed without destroying the stability of the structure.

He testified also that exhibits 1 and 2, representing the imported merchandise, are ready for use in their imported condition. Exhibit 1 weighs approximately 6 pounds and is 4 inches in diameter and 4 inches long, while exhibit 2 weighs approximately 12 pounds and is 5 inches in diameter and 5 inches long.

Smith stated that the use of the cones gives the structure maximum strength with the minimum amount of material and, in his opinion as an engineer, they are structural shapes. The cones may be used horizontally or in any orientation. By their use, the quantity of concrete that would be required is reduced as much as 30 per centum and causes an even greater reduction in the quantity of steel which would otherwise be used. Witness Smith testified that the primary function of exhibits 1 and 2 is to apply compression and to hold it after it has been applied. The steel cables, when in tension, may or may not reinforce the concrete and need not come in contact with the concrete in the member, the real force being that which is exerted on each end thereof by the cones.

The parties hereto have stipulated that the merchandise in issue is in chief value of steel and that the steel does not contain more than

one-tenth of 1 per centum of vanadium, nor more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, nor more than six-tenths of 1 per centum of nickel or cobalt. It was also stipulated that the steel or iron in the merchandise does not contain phosphorus in excess of 5 per centum, nor manganese or silicon in excess of 1 per centum, nor does the merchandise contain any other metallic element used in alloying steel or iron.

What is and what is not a structural shape has been the subject of numerous decisions of this and of our appellate court. An excellent summary of many of such cases is contained in the decision of the Court of Customs and Patent Appeals in *United States* v. *The Winkler-Koch Engineering Co.*, 41 C.C.P.A. (Customs) 121, C.A.D. 540, and several of the cases therein cited have been referred to by the parties herein in their briefs. In *The Winkler-Koch* case, *supra*, the court aptly stated—

We think it would be impossible, under the phraseology adopted by the legislative branch of the Government in the Tariff Act of 1930, for the courts to lay down a rule and declare that such rule settled the questions of what is and, therefore, what is not a structural shape within the meaning of paragraph 312, *supra*.

It appears to be basic that, in order for an article to come within the provision for structural shapes in paragraph 312 of the tariff act, it must be shown by satisfactory evidence that said article has the capacity to sustain relatively heavy weights or to resist great tension with the use of the least amount of material and that it be used in a structure.

The record in this case discloses that the primary and evidently the sole function of the anchorages is to hold the compression transferred to them by the steel wires which have been placed in tension by means of an hydraulic jack and to transmit the compressive force thereby created to the concrete structural member to which they are attached. The result is that said structural member is thereby enabled to withstand greater weights and tensions with a lesser use of material.

It would appear, therefore, that whereas the cones enable the concrete structural members with which they are used to serve an efficient structural function, the anchorages in and of themselves do not possess this quality and do not measure up to what can be judicially construed as structural shapes for tariff purposes.

In support of its claim that the anchorages in controversy are structural shapes for tariff purposes, plaintiff relies primarily upon the case of *United States* v. *Henry Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T.D. 43079, wherein deformed steel bars used to reinforce concrete in structures were held to be structural shapes.

Plaintiffs, in their brief, acknowledge that concrete reinforcement bars, which were held to be classifiable as structural shapes in para-

graph 312 of the Tariff Act of 1922, have since been provided for *eo nomine* in paragraph 304 of the Tariff Act of 1930, but assert that "it does not alter the fact that they are structural shapes although not classifiable as such under the provisions of Par. 312."

As to the use and function of the deformed steel bars in the *Exstein* case, the following is quoted from the decision of the appellate court—

* * * It is also disclosed by the evidence that this material is used in conjunction with concrete in making floors, conduits, bridges, walls, and, in fact, practically every structure where concrete is used. The testimony further discloses that where used in a building, the plans and specifications prepared by the engineer or architect specify the location, size, and strength of such reinforcing material, and that when so used, the ends of the bars are usually bent in such a form that they can be anchored by means of stirrups, or otherwise, to the wall columns or laterals of the building, and, after having been so placed, are surrounded with concrete and become a permanent part of the building, and can not be removed without endangering the stability and strength thereof. If [*sic*] is further shown that these are used in all buildings of steel construction, wherever concrete work is needed, and are also used as a reinforcement in concrete buildings or structures where no steel framework is used. The bending of the ends for attachment to the other members of the building is done by workmen, usually in the progress of construction; when this material is imported it is straight, without any such finishing. When a structure in which such material is used is completed, *the said material assists in carrying both the dead and live loads of the building, has the capacity to resist great tension and compression*, contributes to the stability of the structure, and becomes an integral part of the skeleton of the same. The imported material has not been assembled, manufactured, or advanced beyond hammering, rolling, or casting. [Italics supplied.]

Further in its decision, the court stated—

* * * It is, and has been for years past, bought and sold in the markets of the United States and has been used precisely as other structural shapes of steel. It performs the same functions when so in use. The same impelling legislative reason which caused beams, girders, joists, and the other steel products *eo nomine* specified in said paragraph 312 to be placed there would equally apply to this material. Manifestly, some other forms and shapes of steel were in contemplation than these specifically mentioned, else the words "all other structural shapes of iron or steel" would not have been used.

We are of the opinion that the theory of the *Exstein* case, *supra*, is inapplicable to the present set of facts. The concrete reinforcement bars in the *Exstein* case were found to assist in carrying both the dead and live loads of the building in which they were placed and possessed the capacity to resist great tension and compression.

As has been indicated, *supra*, the anchorages in issue in and of themselves do not serve such a structural function but instead enable the concrete shape with which they are used to carry a greater load or to resist tension.

For the foregoing reasons, we conclude that the claim of plaintiffs for classification of the instant merchandise as structural shapes

within the purview of paragraph 312 of the Tariff Act of 1930, as modified, cannot be sustained and is, therefore, overruled.

Judgment will issue accordingly.