(C.D. 2680)

WEST COAST MERCANTILE CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 11, 1966)

*Stein & Shostak* (*S. Richard Shostak* and *Marjorie M. Shostak* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff, James F. O'Hara*, and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO, FORD, and LANDIS, Judges

LANDIS, Judge: The items of merchandise involved under the two protests consolidated for trial herein are shelf brackets which were classified by the collector of customs as manufactures of metal, not specially provided for, under paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and assessed with duty at the rate of 20 per centum ad valorem on the merchandise imported after June 30, 1957, and 19 per centum ad valorem on the merchandise imported after June 30, 1958. The importer claims that the merchandise is more specifically provided for under paragraph 312 of the same act (19 U.S.C. § 1001, par. 312), as angles or other structural shapes of iron or steel, and that it is properly dutiable thereunder at the rates, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, of 7½ per centum ad valorem if advanced beyond hammering, rolling, or casting, or, alternatively, at 0.1¢ per pound if not so advanced.

The plaintiff contends further that the instant record establishes that the imported shelf brackets were made by hammering, rolling, or casting, within the purview of paragraph 312, *infra.*

Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*      \*      \*      \*      \*      \*      \*

    Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

        Other, composed wholly or in chief value of iron, steel, brass \* \* \*_____ 20% ad val.
                                  [effective 6/30/57]
                                  19% ad val.
                                  [effective 6/30/58]

Paragraph 312 of the Tariff Act of 1930, as modified by T.D. 52739:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of

columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

> Not assembled, manufactured or advanced beyond hammering, rolling, or casting_____ 0.1¢ per lb.
>
> Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 7½% ad val.

Two inquiries are in issue:

1. Are the imported shelf brackets properly dutiable as classified by the collector, as manufactures of metal, not specially provided for, under paragraph 397, as modified, *supra*, or as claimed by plaintiff, under the *eo nomine* provision for angles and other structural shapes of iron or steel in paragraph 312, as modified, *supra?*

2. Are the imported shelf brackets made by hammering, rolling, or casting, as required for classification under paragraph 312, as modified, *supra?*

The record is comprised of the testimony of two witnesses for the plaintiff and the following plantiff's exhibits:

> Exhibits 1, 2, 3, and 4 are examples in different sizes, representative of the imported shelf brackets.
>
> Exhibits 5 and 6 are examples illustrating angles. They are not illustrative of the imported merchandise.
>
> Exhibit 7 is a report of United States Testing Co., Inc., indicating load capacity of the shelf brackets.
>
> Exhibit 8 is an example representative of the merchandise at bar imported from Sweden, covered by protest 62/7369, which was consolidated for trial herein.
>
> Exhibits 9, 10, and 11 are examples illustrative of a channel. They are not illustrative of the imported merchandise.
>
> Exhibits 12, 13, and 14 are photographs of the machine on which the shelf brackets are manufactured, showing various stages in manufacture.
>
> Exhibit 15 is a diagram illustrating a flat metal strip out of which brackets in process are stamped.
>
> Exhibit 16 is a diagram illustrating how the angle is formed in the shelf bracket.
>
> Exhibit 17 is a diagram illustrating how the angle rib is formed in the shelf bracket.
>
> Exhibit 18 is a diagram illustrating how the holes are punched and embossed marks are made on the shelf brackets.

At the initial hearing, the first four of the above exhibits, representative of the merchandise at bar, were received in evidence. These were four gray-colored shelf brackets identical, except for color, to the imported black brackets listed on the invoices.

At the second hearing, protest 62/7369 was consolidated for trial with the initial protest herein, No. 59/22165(B). It was stipulated

that exhibits 1 to 4, inclusive, and exhibit 8 are manufactures of iron or steel.

Hyman Ledeen, the first witness for plaintiff, was the president of a company manufacturing light and heavy equipment used in steel mills, shipyards, and airplane plants. He was a graduate engineer in mechanical engineering and studied the use of structural members and the application of forces and loads to such use. He was a member of the American Society of Mechanical Engineers and the National Fluid Power Association, and stated he had supplied equipment for use by the Navy in atomic tests, in which structural shapes including channels, angles, and beams, had been used, and that he was familiar with the process of manufacturing angles, such as plaintiff's exhibits 1, 2, 3, 4, and 8, the exemplars representative of the merchandise at issue herein, which he stated are angle brackets; that he had not observed the method of manufacture of the imported merchandise in question here, but had seen merchandise of this type manufactured in the United States, had manufactured similar material, and knew how the articles were usually made. He explained such articles could be made by hand but usually were made by machine. This is indicated by the markings on the shelf brackets at bar.

Mr. Ledeen stated his definition of the term "structural shape" as follows:

Usually a piece of steel that has been changed from its flat shape into some other shape—angle, or channel, or tubular—that makes it possible to support more load with the same amount of weight; or shall I say, conversely, the same load with a lesser amount of weight.

He stated that, in his opinion, plaintiff's exhibits 1, 2, and 3 are structural shapes, because they are shaped especially to support a maximum load with a minimum of material.

A report of the United States Testing Co., Inc. (plaintiff's exhibit 7), illustrating shelf brackets identical to the merchandise at issue in all respects, including size, gauge, and shape of the metal, indicates the shelf brackets at bar, weighing from 1.4 to 11.2 ounces, have a load bearing capacity of from 166 to 358 pounds.

A number of additional exhibits, identified by the witness as illustrative of structural shapes, were received in evidence as plaintiff's exhibits 5, 6, 9, 10, and 11. Plaintiff's exhibits 5 and 6 were identified by Mr. Ledeen as angles. He stated that, on the basis of his professional understanding, he could determine, by looking at an angle such as plaintiff's exhibit 5, how the same was made because he had worked in steel mills with steel engineers, had helped provide equipment to make angles, and that he knew it was made by rolling. He identified

plaintiff's exhibit 6 as an angle, made under his direction and control, in his own shop from a piece of flat steel stuck into a vise and bent over; he stated a thinner piece could be bent by hand, but a heavier piece would require something to push it; that, to start with, the material was flat rolled, plate shaped by rolling. A sample identified by the witness as a rolled channel was received in evidence as plaintiff's exhibit 9. Mr. Ledeen stated that by "rolled," he meant that the material is heated to red-hot or white-hot heat, and pushed through a machine that has rotating rollers which shape a flat piece into the shape of this exhibit.

Another exemplar, identified by the witness as a channel made in his own shop by a rolling and bending process, was received in evidence as plaintiff's exhibit 10.

Exhibit 11 was identified by the witness as a channel made under his direction in a subcontractor's plant in a bending machine by bending a flat-rolled piece of steel at each end to form the channel.

Mr. Ledeen testified that, in his opinion, exhibits 1 through 4 and exhibit 8 are angle brackets which are structural shapes; that he regards them as structural shapes because they are shaped as an angle and are built for the purpose of supporting heavy loads.

At a second hearing herein, Mr. Cecil Mansour, called as a witness for the plaintiff, testified that he is the president of West Coast Mercantile Co., the plaintiff herein; that the business of the company is importing hardware, tools, and shelf brackets and that he had been engaged in that business for about 10 years.

Mr. Mansour testified that he purchased the merchandise covered by the invoice from Thomas Crompton & Sons in England; that he had visited the factory of Thomas Crompton on several occasions and had observed the machinery on which the shelf brackets were made; that he was particularly interested in observing it, since he was buying large quantities of the merchandise. He identified a photograph (plaintiff's exhibit 12) as being of such a machine which he had observed in the Crompton factory. He explained that the "V" shapes in the lower left-hand corner of the illustration are articles which he recognized as shelf brackets; that in the condition depicted, they are cutouts of sheet iron.

Two additional photographs of the machine were received in evidence as plaintiff's exhibits 13 and 14. Mr. Mansour testified that plaintiff's exhibit 13 is a photograph of the machine on which the shelf brackets were made. It shows a shelf bracket in position on the machine, being held by a worker, in process of manufacture, he stated, and that the illustration also shows the hammer which is the cylindrical upper part of the machine which comes down continuously and bangs

two dies together; that he had observed the process; and that plaintiff's exhibit 14 is another illustration of the same machine.

Mr. Mansour testified that the holes in the shelf brackets are made after the article is formed in another machine, a punching machine similar to the one illustrated in the photograph.

At the second hearing, Mr. Ledeen was recalled and further testified that he was familiar with the machine illustrated by plaintiff's exhibits 12, 13, and 14, on which the shelf brackets at bar were made, saying that he had designed such machines; that he was mechanical engineer for the Toledo Machine & Tool Co. and later for the E. W. Bliss Co., which is one of the world-leading maufacturers of this equipment; and that he could tell from the photographs the kind of machine upon which the shelf brackets at bar were made, and from examining the samples of the said shelf brackets, the method by which they were manufactured since they bear markings which indicate the method of their manufacture.

The witness Ledeen described the process by which the shelf brackets were made in the machines illustrated by plaintiff's exhibits 12, 13, and 14, as follows:

You start with a piece of stripped steel, sometimes a long piece of stripped steel. This would be about 2½ inches wide and 20 feet long, or it might be on a coil, which would run into hundreds of feet, and it is fed into a machine. This being flat, you come down with a hammer blow, and you cut out this round portion, and cut out this taper, and the same thing here, all in one operation.

An illustration or sketch which shows the initial process described by Mr. Ledeen was also received in evidence as plaintiff's exhibit 15.

Additional sketches made by Mr. Ledeen to indicate the various stages in the manufacture of these articles were received as plaintiff's exhibits 16, 17, and 18, and the further process of manufacture was described by him as follows: The flat piece of metal stamped out, as illustrated in plaintiff's exhibit 15, is set on top of a die, called a bottom die, and is hit with a hammer below that bends the flat metal sheet to a 90 degree angle, or whatever angle desired; the bending operation is done by a hammer blow.

A sketch received in evidence as plaintiff's exhibit 16, illustrates the top die, the bottom die, and the blank. Mr. Ledeen defined "the blank" as the piece (the flat shape) that had been blanked out in the first operation, illustrated by plaintiff's exhibit 15. The witness explained that the dotted line in plaintiff's exhibit 16 shows the shape which the piece of steel will assume, after the top die has come down and brought the piece of steel in contact with the bottom die completely.

Mr. Ledeen further testified that, in plaintiff's exhibit 12, the shapes in the lower left-hand corner are the pieces that have been blanked and bent as illustrated in plaintiff's exhibits 15 and 16.

The next step in the procedure of manufacturing shelf brackets, the witness continued, was to put the partly manufactured shelf bracket into a die with the point of the angle up. It is set down in this position and a top die comes down and forms the rib (the impression or indentation in the article). The rib is made for the purpose of giving extra strength to the material. A sketch showing that operation and describing the process was received in evidence as plaintiff's exhibit 17. Exhibits 12, 13, and 14 also illustrate the step of forming the rib. After the rib has been formed, the article is set down vertically on the machine, and three holes are punched at one time. An examination of plaintiff's exhibit 2 also indicates that some embossing was done, which is visible in the form of a little circle around the holes. One leg of the angle is put into the machine first, and then the other leg, in the vertical position, and the holes are punched and the circle embossed on each leg. A sketch of the process of punching the holes, with language describing the operation, was received in evidence as plaintiff's exhibit 18.

The witness testified that the photographs (plaintiff's exhibits 12, 13, and 14) show that portion of the machine which moves the dies; that the cyclindrical portion in the center of the upper portion of the photographs is a crank type of press; that the vertical portion in the upper part of the photographs is actually part of the crank; that there is a horizontal shaft across and that, as the shaft goes around, it brings down the die and hits the blow; that beyond the card, there will be a flywheel to give it added force. These parts of the machines were identified by Mr. Ledeen on plaintiff's exhibit 12 as follows:

| | |
|---|---|
| U.D. | Upper Die |
| CR | Crank |
| FL | Fly Wheel |
| BD | Bottom Die |

He stated that in engineering parlance, all the processes which he had described are stamping processes; that "stamping" is a hammering process; that a hammering process is striking a blow at metal, the same as you would strike with a hammer in driving a nail, or hitting a chisel.

On cross-examination, Mr. Ledeen testified that, in his understanding, hammering and stamping are identical processes; that stamping is always a hammering process, but that hammering is not always necessarily stamping; that hammering is a bigger term than stamping; that stamping is one form of hammering, and consists of hitting

a big hammer blow, to shear material, or to bend it, or to shape it. On re-cross-examination, the witness stated that the banging operation in the formation of the articles at bar is pure stamping and that the rib is formed by hammering.

The merchandise before the court (represented by exhibits 1 to 4, inclusive, and exhibit 8) admittedly are shelf brackets. The importer claims these to be structural shapes.

The first inquiry, therefore, must be to ascertain the meaning tariffwise of the term "structural shape" with the aid of such definitions thereof as might be found in standard dictionaries, engineering manuals, and other available sources, including those afforded in the adjudicated cases on the subject.

Reference to Webster's New International Dictionary, second edition, unabridged (1945), gives the following pertinent definitions:

structure, n. * * * 1. Act of building; construction. *Obs.* 2. Manner of building; form; make; construction. 3. Something constructed or built, as a building, a dam, a bridge; esp., a building of some size; an edifice. * * *

structural, n. Short for STRUCTURAL STEEL.

structural, adj. 1. Of or pertaining to structure or a structure; affecting structure; used in building structures; constructional; * * *.

structural shape. *Engin. & Arch.* The shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, any steel or iron member of such shape, as channel irons, I beams, T beams, etc., or, sometimes, a column, girder, etc., built up with such members.

At the outset, we note in *The Frost Railway Supply Co.* v. *United States*, 39 CCPA 90, C.A.D. 469, the court in speaking of structural shapes said (pages 92–93) :

This court has had occasion in the past to define "structural shapes" as that term is applied to specific merchandise. No precise definition, however, can be laid down to cover the term, each case depending on its own record for determination. *Judson Freight Forwarding Co.* v. *United States*, 20 C.C.P.A. (Customs) 229, 235, T.D. 46038; *Otis McAllister & Co.* v. *United States*, 27 C.C.P.A. (Customs) 4, 6, C.A.D. 52.

The *Frost Railway* case, *supra*, involved railroad truck coiled spring snubbers arranged in concentric form in nests to reduce violence in a railroad car. They were held not to be structural shapes. The court observed that, since the snubbers were not of unitary construction, that is, they consisted of more than one piece of metal, they were obviously not within the meaning of the term "structural shape," as the words are defined in either standard dictionaries or engineering works, and that the snubbers in this sense were not de-

signed to give the greatest strength with the least material. Nor was merchandise of this type bought and sold as structural shapes. However, the *Frost* case is a generous source of other decided cases classifying numerous articles with relation to paragraph 312. These, analyzed and considered together, afford a base of consideration from which may be evaluated the essential characteristics of merchandise classifiable as structural shapes.

In *United States* v. *Humble Oil & Refining Co.*, *Leslie B. Canion, et al.*, 46 CCPA 138, 141, C.A.D. 717, the court stated that the meaning of "structural shape"—

\* \* \* must be determined on the basis of the particular circumstances of the case under consideration, including the purpose for and manner in which the article is used, as well as whether or not it forms a part of a structure.

From a case frequently referred to as a "pioneer case on structural shapes," *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537, page 276, we quote:

Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use. But however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

In the *Simon, Buhler* case, *supra*, steel channels, grates, and bars used in the construction of a ponderous brewery mash filter, a structure 30 feet long, 4 or 5 feet high, and 4 or 5 feet wide, were held to be structural shapes. The court there reasoned that Congress had in mind more than two kinds of structures (ships and buildings), when the provision was passed.

The *Simon, Buhler* case arose under paragraph 104 of the Tariff Act of 1913 (predecessor of paragraph 312 of the 1922 Tariff Act, which in turn was reenacted into paragraph 312 of the 1930 Tariff Act, as modified by trade agreement). The case connoted of structural shapes a capacity to sustain heavy weights or resistance to great tension, or both.

However, this view was modified by a later leading case on structural shapes, *Judson Freight Forwarding Co.* v. *United States*, 20 CCPA

229, T.D. 46038. There, certain steel angles 2 by 2 by $\frac{3}{16}$ inches were held to be structural shapes, the court saying in effect that, in its opinion, Congress intended the term "structural shape" to include all structural shapes of iron or steel having the capacity to sustain (relatively) heavy weights or to resist great tension, or both, and designed for use in such capacity in the construction of buildings, derricks, and other structures requiring either heavy or light sections; that there was no limitation to large structures only. The court also noted the following information furnished by the Tariff Commission, as quoted from the Summary of Tariff Information, 1920, page 185:

Description and uses.—*Structural shapes* are iron or steel rolled for structural purposes. They are classified into heavy and light—the latter being those with the leg or web less than 3 inches—and are given commercial names, e.g., I-beams, channels, joists, girders, angles, tees, and zees, names largely descriptive of their cross-section appearance. Nearly 90 per cent of the country's production are heavy structural shapes. They are used in buildings, bridges, ships, cars, etc. Light shapes are used in the manufacture of agricultural implements, bedsteads, fences, safes, automobiles, and other articles requiring light sections.

From the cases analyzed herein on the subject of structural shapes, including those cited by both counsel, as well as other cases found pertinent by the court, certain positive principles are established which are quite determinative as to whether or not something is a structure, or whether some article is such a structural member thereof that it constitutes a structural shape within the meaning of paragraph 312 of the tariff act. Further, it is to be noted that an article may not be excluded from classification as a structural shape merely because it is not of the same kind, nature, or class as the articles enumerated in paragraph 312, according to *United States* v. *The Winkler-Koch Engineering Co.*, 41 CCPA 121, C.A.D. 540. Each case depends upon its own record for adjudication.

The cases decided on the subject at bar afford a faithful interpretation of the congressional intent and of what was meant by the words of the statute to embrace structural shapes. We are quite aware that a structure may be a building, a ship, a bridge, an oil well casing, scaffolding, an airplane approach, or an iron bedstead, all among the innumerable possible kinds of structures, comprised of parts called structural members which are structural shapes. To be such a member, the prime purpose of the article must be to support the structure of which it is a part. It is, thus, not enough to say that bolts, nuts, nails, couplings, etc., are an integral part of a structure and, thus, are structural shapes. Integral as those articles are, their prime purpose is to *join together*, but they themselves are not structural members. Being

integral alone, therefore, is *not enough to establish classification*. Unquestionably these articles lend strength to the structure, but such strength and support are incidental to their prime purpose.

In *United States* v. *The Winkler-Koch Engineering Co., supra*, involving an importation of 2,100 sections of cylindrical oil well casings, each section 7 inches in outside diameter, ranging from 25 to 32 feet in length, with ends threaded by machining for joining together, whether by screwing or with couplings, the court held in effect that an entire oil well casing constituted a structure, and the separate sections thereof, as imported, were structural shapes.

In *Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T.D. 40490, connecting rods for locomotive drive wheels were held not classifiable as structural shapes; *Amerlux Steel Corp.* v. *United States*, 18 CCPA 449, T.D. 44700, held that checkered or raised diamond steel floor plates were not classifiable as structural shapes; *European Trading Co.* v. *United States*, 19 CCPA 82, T.D. 45225, wire netting used for no purpose other than holding stucco together on the sides of structures or buildings was held not classifiable as structural shapes.

In *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T.D. 42184, certain steel sheet piling was held properly classifiable as iron or steel structural shapes; *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T.D. 43079, deformed steel bars for reinforcing concrete were held to be structural shapes, although the court pointed out that the bars might be considered a borderline material; *Otis McAllister & Co.* v. *United States*, 27 CCPA 4, C.A.D. 52, held that corrugated iron sheets used principally in the construction of buildings as walls and roofs were not structural shapes, and although walls and roofs lent a measure of strength to the structure, such strength was merely incidental.

The plaintiff's first premise is well supported in its brief with cited authorities that, in customs jurisprudence, samples are often potent witnesses, and the plaintiff's testimony is that the shelf brackets in issue are in the shape and form of angles. We, however, do not accept that the said exhibits are such angles as are named in paragraph 312 of the tariff act, or that the *eo nomine* provision of the said paragraph for angles contemplated all angles of iron or steel without regard for their purpose. The paragraph contemplates angles which are structural shapes. A metal bookend might be in the shape and form of an angle, yet it would not qualify as a structural shape. The definitions and numerous citations reviewed hereinbefore set forth characteristics of structural shapes, but these are not possessed by the merchandise at bar as represented by exhibits 1, 2, 3, 4, and 8. Admittedly, they are shelf brackets; they support no structure. They do not lend strength, even incidental to the structure, nor were they designed to do so.

Examination of the physical articles (exhibits 1 through 4, and exhibit 8) demonstrates this quite clearly. Their physical appearance indicates processing beyond angles. The shelf brackets involved herein are not *ejusdem generis* with the articles designated by name in paragraph 312. They are articles of commerce commonly recognized and known as shelf brackets.

On the other hand, while plaintiff's exhibits 5, 6, 9, and 11 are not in issue, they might be proven readily enough as angles and channels, constituting such structural shapes as are contemplated by paragraph 312. These latter exhibits, obviously offered for purposes of comparison, rather point up what the shelf brackets in issue are not, particularly in the tariff sense. The purpose and function of the shelf brackets before us is to support a shelf and not a structure, either heavy or light, large or small.

Certain cited cases, including *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T.D. 38966, establishing that, where a dutiable provision of a tariff statute designates an articles *eo nomine*, without terms of limitation, all forms of the article are thereby included, unless a contrary intention appears, have no application herein. In our opinion, the shelf brackets at bar are not structural angles as contemplated by paragraph 312.

Thus, having found that the shelf brackets in controversy are not within the purview of paragraph 312, *supra*, further argument of counsel concerning the process of their manufacture is obviated. The testimony of Mr. Ledeen, alleging that the shelf brackets are angles, is a mere conclusion.

Based upon the entire record herein and upon the pertinent cases analyzed, this court is of the opinion that the shelf brackets at bar are not such articles as constitute structural shapes within the purview of paragraph 312 of the Tariff Act of 1930, as modified, *supra*.

The protests, therefore, are overruled. The classification of the collector is affirmed.

Judgment will issue accordingly.